## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| CORAM HEALTHCARE CORP. and CORAM, INC., | : Case No. 00-3299 (MFW) |
| | : |
| | : (Jointly Administered) |
| Debtors. | : |
| ———————————————— | : |
| | : |
| ARLIN M. ADAMS, as Chapter 11 Trustee of the Bankruptcy Estates of Coram Healthcare Corp. and Coram, Inc. | : Adv. Proc. No. 06-50639-MFW |
| | : |
| | : |
| | : |
| Plaintiff/Appellee, | : |
| | : |
| v. | : |
| | : |
| GENESIS INSURANCE COMPANY, | : |
| | : |
| Defendant/Appellant. | : |
| ———————————————— | : |

—————————————————————————————

**CORRECTED ANSWERING BRIEF OF PLAINTIFF ARLIN M. ADAMS,
CHAPTER 11 TRUSTEE OF CORAM HEALTHCARE CORP. AND
CORAM, INC. (I) IN OPPOSITION TO MOTION OF
GENESIS INSURANCE COMPANY FOR LEAVE TO APPEAL, AND
(II) IN SUPPORT OF CROSS-MOTION TO DISMISS APPEAL**
—————————————————————————————

| | |
|---|---|
| Richard A. Barkasy (#4683) | Barry E. Bressler |
| Michael J. Barrie (#4684) | Wilbur L. Kipnes |
| SCHNADER HARRISON SEGAL | SCHNADER HARRISON SEGAL |
| & LEWIS LLP | & LEWIS LLP |
| 824 N. Market Street, Suite 1001 | 1600 Market Street, Suite 3600 |
| Wilmington, DE  19801 | Philadelphia, PA, 19103-7286 |
| (302) 888-4554 | (215) 751-2000 |

Attorneys for Plaintiff,
Arlin M. Adams, as Chapter 11 Trustee

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

NATURE AND STAGE OF PROCEEDING ........................................................................ 1

SUMMARY OF THE ARGUMENT ...................................................................................... 2

COUNTER-STATEMENT OF THE FACTS ........................................................................ 3

    A.   The Debtors and the R-Net Subsidiaries............................................................... 3

    B.   The R-Net Adversary Proceeding. ........................................................................ 4

    C.   The Genesis Insurance Policy and Notification of Claim.................................... 4

    D.   Settlement of the R-Net Adversary Action After Protracted Settlement
        Negotiations. ........................................................................................................ 5

    E.   The Trustee's Plan and Approval of the R-Net Settlement in the Debtors'
        Bankruptcy Cases................................................................................................. 5

ARGUMENT ......................................................................................................................... 8

I.      THE AUGUST 7 ORDER IS NOT A FINAL ORDER. ................................... 8

II.     GENESIS SHOULD NOT BE GRANTED LEAVE TO APPEAL THE
        AUGUST 7 ORDER........................................................................................... 10

III.    THE COURT SHOULD DISMISS THE APPEAL. ....................................... 14

CONCLUSION...................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ablitt & Caruolo, P.C. v. Michaud*, No. 05-cv-391-PB, 2006 U.S. Dist. LEXIS 43840 (D.N.H. Jun. 27, 2006) ........................................................................... 9

*Basher v. U.S. (In re Basher)*, 301 B.R. 175 (Bankr. E.D. Pa. 2003) ................................ 8

*Belli v. Temkin (In re Belli)*, 268 B.R. 851 (9th Cir. B.A.P. 2001) .................................... 8

*Binder v. Price Waterhouse Co., LLP (In re Resorts International, Inc.)*, 372 F.3d 154 (3d Cir. 2004) ...................................................................................... 1, 2, 12

*Caraballo-Seda, et al.  v. Mun. of Hormigueros, et al.*, 395 F.3d 7 (1st Cir. 2005) ......... 14

*Catlin, et al. v. U.S.*, 324 U.S. 229 (1945) ........................................................................ 9

*Clark v. First State Bank (In re White Beauty View, Inc.)*, 841 F.2d 524 (3d Cir. 1988) ....................................................................................................................... 8

*Cobbledic v.U.S.,* 309 U.S. 323 (1940) ............................................................................ 10

*Dal-Tile Int'l, Inc. v. Color Tile, Inc.*, 203 B.R. 554 (D. Del. 1996) ............................... 11

*Eastern Airlines, Inc. v. Brown & Williams Tobacco Corp. (In re Ionosphere Clubs, Inc.)*, No. 89 B 10448 (BRL), 1999 U.S. Dist. LEXIS 14316 (S.D.N.Y. Sep. 14, 1999) ....................................................................................................... 11

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974) ........................................................ 10

*Firestone Tire and Rubber Co. v. Risjord,* 449 U.S. 368 (1981) ....................................... 9

*Gaylord Entertainment Co. v. Gilmore Entertainment Group, LLC.*, 187 F.Supp.2d 926 (M.D. Tenn. 1999) .................................................................... 11

*Harrison v. Nissan Motor Corp. in U.S.A.,* 111 F.3d 343 (3d Cir. 1997) ......................... 9

*Huberman v. Duane Fellows, Inc.*, No, 87 Civ 8573 (PKL), 1989 U.S. Dist. LEXIS 15329 (S.D.N.Y. Dec. 27, 1989) ...................................................... 13

*In re Coram Healthcare Corp., et al.*, 315 B.R. 321 (Bankr. D. Del 2004) ...................... 7

*In re Ctr. for Advanced Mfg. & Tech.*, No. 05-3292006 U.S. Dist. LEXIS 6389 (W.D. Pa. Feb. 13, 2006) ...................................................................................... 11

*In re Del. and Hudson Ry. Co.*, 96 B.R. 469 (D. Del. 1989) ...................................... 9, 10

*In re Magic Restaurants, Inc.*, 202 B.R. 24 (D. Del. 1996) ....................................... 13, 14

*In re Neshaminy Office Bldg. Assoc.*, 81 B.R. 301 (E.D. Pa. 1987) ................................ 12

*In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 U.S. Dist. LEXIS 22718 (S.D.N.Y. Dec. 17, 2003) .............................................................. 13

*Jasin v. Kunkel (In re Kunkel)*, No. 03-mc-236, 2003 U.S. Dist. LEXIS 23725 (E.D. Pa. Dec. 29, 2003) ...................................................................................... 10

PHDATA 1393527_1

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 223 F.Supp.2d 16 (D.D.C. 2002) ........................................................................................... 10, 11

*Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21 (2d Cir. 1990) ..................................... 11

*Lauro Lines S.R.L. v. Chasser, et al.*, 490 U.S. 495 (1989) ................................................ 9

*McGowan v. Global Indus., Inc. (In re Nat'l Office Prod., Inc.)*, 116 B.R. 19 (D.R.I. 1990) ............................................................................................................ 9

*Mikes v. Straus*, 939 F. Supp. 301 (S.D.N.Y. 1996) .......................................................... 13

*Murphy v. Sec. Investor Protection Corp.*, No. 05-2311, 2005 U. S. Dist. LEXIS 23769 (E.D. Pa. Oct. 14, 2005) ...................................................................................... 8

*Natale v. French & Pickering Creeks Conservation Trust, Inc. (In re Natale)*, 295 F.3d 375 (3d Cir. 2002) ................................................................................................. 8

*Stubbe v. Bonco Cent. Corp. (In re Empresas Noroeste, Inc.)*, 806 F.2d 315 (1st Cir. 1986) ........................................................................................................................ 9

**Statutes**

28 U.S.C. § 1334 ....................................................................................................... 2, 12

28 U.S.C. § 157 .................................................................................................... 2, 4, 11

28 U.S.C. § 158 ........................................................................................................... 10

## NATURE AND STAGE OF PROCEEDING

Plaintiff Arlin M. Adams (the "Trustee"), the Chapter 11 Trustee of the bankruptcy estates of Coram Healthcare Corp. ("CHC") and Coram, Inc. ("CI," and together with CHC, the "Debtors" or "Coram") commenced the above-captioned adversary proceeding against Defendant Genesis Insurance Company ("Genesis") by filing a complaint on April 26, 2006.  (Case No. 00-3299 (Bankr. D. Del.) Docket Index No. ("D.I.") 1.)  On June 7, 2006, Genesis filed the Motion of Genesis Insurance Company to Dismiss the Complaint (the "Motion"), (D.I. 5, 7), asserting that the Bankruptcy Court lacked subject matter jurisdiction.  "Convinced that the Trustee is correct," (Transcript from Hearing Held Jul. 25, 2006, a true and correct copy of which is annexed hereto as Exhibit A ("Hrg. Tr."), 15:22), the Bankruptcy Court found at the hearing held on July 25, 2006 (the "Hearing") that "there's a close enough nexus to the plan and confirmation order to provide that the Court has jurisdiction over this cause of action. . ."  (Hrg. Tr. 16:25-17:2; *see also* Hrg. Tr. 16:1-3 ("I do find under the *Resorts* case that there is a close nexus to the Court's jurisdiction in administering the confirmed plan").)

In support of its holding, the Bankruptcy Court made the following findings, which it found "significant," that distinguished this litigation from *Binder v. Price Waterhouse Co., LLP (In re Resorts International, Inc.)*, 372 F.3d 154 (3d Cir. 2004), and those other cases where courts have declined to exercise a bankruptcy court's "related to" jurisdiction:

- In this case, there is a Chapter 11 Trustee – something notably lacking in *Resorts* – who has certain specified duties identified in

the Bankruptcy Code that all relate to the administration of the estate. (Hrg. Tr. 9:19-25, 16:3-7.)

- In this case, a representative of the bankruptcy estate is pursuing the claim (i.e., the Chapter 11 Trustee), as opposed to the private litigation trust in *Resorts*, where there was no longer any estate or estate representative. (Hrg. Tr. 16:5-9.)

- In this case, creditors remain and are due a distribution from the net proceeds from any recovery from Genesis under the terms of the Trustee's confirmed Plan. (Hrg. Tr. 16:9-12.)

- In this case, there is no possibility of limitless litigation because this lawsuit is a pre-confirmation or confirmation claim and not a post-confirmation cause of action, as was the case in *Resorts*. (Hrg. Tr. 16:12-16.)

- In this case, there is still a bankruptcy estate requiring continued administration. (Hrg. Tr. 11:10-11.)

- In this case, the litigation has a relationship to a settlement which was specifically identified in the plan and disclosure statement and is not a cause of action that "just comes out of the blue." (Hrg. Tr. 16:20-25.)

On August 7, 2006, the Bankruptcy Court entered its Order formally denying Genesis' motion (the "August 7 Order"), in accordance with its decision at the Hearing, and specifically found subject matter jurisdiction to exist under 28 U.S.C. 157(a) & (c) and 28 U.S.C. § 1334(b) because this matter is "related to" the Debtors' bankruptcy cases. (D.I. 29.) On August 18, 2006, Genesis filed its notice of appeal, (D.I. 32), together with its Motion for Leave to Appeal, (D.I. 30), which, for the reasons set forth below, the Trustee opposes.

## SUMMARY OF THE ARGUMENT

1.    In arguing that the Bankruptcy Court's August 7 Order is final for appeal purposes, Genesis ignores the appropriate legal standard. In adversary proceedings, the finality of bankruptcy court orders is determined by the same standard that is employed in

2

general civil litigation, not the somewhat relaxed standard that is applied to bankruptcy case orders generally. Measured by the appropriate legal standard, the August 7 Order is clearly not a final order, because it does not end the litigation on the merits. Consequently, Genesis has no right to appeal now from the Bankruptcy Court's interlocutory order.

2.    Genesis cannot make the requisite showing of "exceptional circumstances" justifying leave to appeal and immediate review of the August 7 Order. Genesis does not raise a controlling issue of law upon which there are substantial grounds for a difference of opinion. In addition, rather than expediting matters, an interlocutory appeal here would only needlessly delay the progress of the adversary proceeding.

## COUNTER-STATEMENT OF THE FACTS

### A.    The Debtors and the R-Net Subsidiaries.

Coram Resource Network, Inc. ("CRN") and Coram Independent Practice Association, Inc. ("CIPA," and together with CRN, the "R-Net Subsidiaries") are debtors in the jointly administered bankruptcy cases pending in the United States Bankruptcy Court for the District of Delaware before Chief Bankruptcy Judge Mary F. Walrath (the "Bankruptcy Court"), captioned *In re Coram Resource Network, Inc., et al.*, Case No 99-02889(MFW). The R-Net Subsidiaries were wholly owned subsidiaries of CI, which, together with CHC, are also debtors in the separate, jointly administered bankruptcy case, also pending before Chief Judge Walrath in the Bankruptcy Court captioned *In re Coram Healthcare Corp., et al.*, Case No. 00-03299(MFW).

**B.**    **The R-Net Adversary Proceeding.**

On or about November 13, 2001, the Official Committee of Unsecured Creditors appointed in R-Net's bankruptcy cases (the "R-Net Creditors' Committee") commenced an adversary proceeding in the R-Net Subsidiaries' bankruptcy case (the "R-Net Adversary Proceeding") against, *inter alia*, the Coram Debtors and certain officers and directors of the Debtors.  The Second Amended Complaint filed by the R-Net Creditors' Committee in the R-Net Adversary Proceeding includes claims for, among other things, breach of fiduciary duty, fraud and negligent misrepresentation and sought recovery of $55,990,000 in compensatory damages, as well as the imposition of punitive damages.  On January 10, 2003, this Court entered an Order withdrawing the reference of the R-Net Adversary Proceeding to the District Court, pursuant to 28 U.S.C. § 157.

**C.**    **The Genesis Insurance Policy and Notification of Claim.**

The Debtors purchased from Genesis a Directors' and Officers' Liability Policy (Policy Number YXB001625A) (the "Policy"), a true and correct copy of which is annexed as Exhibit B.  The Policy, as amended, covered the period from January 8, 1999 through January 27, 2001, (Policy, ITEM 2), with a discovery period for reporting claims extending until January 27, 2002.  (Policy, III.)  Under the Policy, Genesis promised to pay on behalf of the Debtors claims based on wrongful acts of the Debtors' officers and directors, (Policy, I.B.), such as the claims made against the officers and directors in the R-Net Adversary Proceeding.

Shortly after commencement of the R-Net Adversary Proceeding, CHC timely notified Genesis of the action and the officers and directors retained counsel who looked to Genesis for payment under the terms of the Policy.  Genesis, however, offered

to pay only forty percent (40%) of its insureds' defense costs. (*See* Letter from Jason Cronic to Leo Cunningham of February 14, 2002, a true and correct copy of which is annexed as Exhibit C.)

    **D.**    **Settlement of the R-Net Adversary Action After Protracted Settlement Negotiations.**

    After protracted settlement negotiations, the Trustee entered into a settlement agreement with the R-Net Creditors' Committee (the "R-Net Settlement Agreement"). A true and correct copy of the R-Net Settlement Agreement is annexed as Exhibit D. The Trustee attempted to involve Genesis in the settlement discussions, but Genesis rebuffed those efforts and declined to participate, continuing to "reserve all of its rights." (*See* letter from Jason Cronic, Esquire to Wilbur L. Kipnes, Esquire of April 24, 2003, a true and correct copy of which is annexed as Exhibit E and letter from Wilbur L. Kipnes, Esquire to Jason Cronic, Esquire of May 2, 2003, a true and correct copy of which is annexed as Exhibit F.)

    The R-Net Settlement Agreement, which was contingent upon approval by the Bankruptcy Court in both the Debtors' and the R-Net Subsidiaries' bankruptcy cases, substantially reduced and fixed at $7.95 million the R-Net Subsidiaries' claim. The R-Net Settlement Agreement also provided for dismissal of the Second Amended Complaint, including the claims against officers and directors, with prejudice.

    **E.**    **The Trustee's Plan and Approval of the R-Net Settlement in the Debtors' Bankruptcy Cases.**

    On May 2, 2003, the Trustee filed the Chapter 11 Trustee's Joint Plan of Reorganization, which was subsequently amended and modified (the "Trustee's Plan"). A true and correct copy of the Trustee's Second Amended Plan of Reorganization is

PHDATA 1393527_1

annexed as Exhibit G.  Among other things, the Trustee's Plan provided for the

following:

- Approval of the R-Net Settlement Agreement.  (*See* Trustee's Plan, § 7.2.);

- The Trustee's retention of the sole and exclusive right, from and after the Effective Date, to commence, prosecute, compromise and seek Bankruptcy Court approval of any settlement of any of the Causes of Action on behalf of the Debtors' estate. (Trustee's Plan, § 5.3);

- Distribution of proceeds from the Causes of Action as follows:  (a) First, to Reorganized Coram on an amount equal to the Post-Effective Date Administrative Claims relating to the Causes of Action; (b) Second, to the holders of Allowed General Unsecured Claims on a *pro rata* basis in an amount equal to the interest accruing from the Petition Date through the Effective Date on account of such Allowed General Unsecured Claim; and (c) Third, on a *pro rata* basis to the holders of CHC Equity Interests. (Trustee's Plan, ¶ 5.3);

- Retention of jurisdiction for, among other things, the following purposes: to determine any (i) pending and/or future motions, applications and adversary proceedings; (ii) causes of action against third persons; (iii) adversary proceedings; and (iv) contested and litigated matters. (Trustee's Plan, § 14(c));

- Retention of jurisdiction to, among other things, determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code.  (Trustee's Plan, § 14(g).)

The subject matter of this adversary proceeding clearly falls within the definition of

"Cause of Action" under the Trustee's Plan, which includes:

> any claims, rights, causes of action of the Debtors, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, based in whole or in part upon any act, omission or other occurrence having taken place on or prior to the Effective Date in any way relating to the Debtor."

(Trustee's Plan, § 1.10.)

PHDATA 1393527_1

During the lengthy contested confirmation hearing on his Plan, the Trustee presented extensive evidence regarding the R-Net Settlement Agreement. After considering the strength of the claims and the attendant risks, as well as the costs and delay resulting from further litigation, the Bankruptcy Court found the R-Net Settlement Agreement to be reasonable and approved it. *In re Coram Healthcare Corp., et al.*, 315 B.R. 321, 330-31 (Bankr. D. Del 2004). In addition, the Order Confirming the Trustee's Plan (the "Confirmation Order") provided that "[f]or the reasons and based upon the findings and conclusions set forth in the Opinion, the compromise and settlement between the Trustee and R-Net, incorporated in the Plan, is hereby approved pursuant to Bankruptcy Rule 9019 and is binding upon all entities affected thereby." (Conf. Order., ¶ 26.)[1]

The Confirmation Order vested the Trustee with the "sole and exclusive right, from and after the Effective Date, to commence, prosecute, compromise and seek Bankruptcy Court approval of any settlement of any of the Causes of Action on behalf of the Debtors' estate . . ." (Conf. Order, ¶ 50.) Moreover, in the Confirmation Order, the Bankruptcy Court expressly retained jurisdiction over the matters set forth in Article 11 of the Trustee's Plan, including those matters enumerated above.

Notwithstanding approval of the Bankruptcy Court in both R-Net's and the Coram Debtors' bankruptcy cases, Genesis continued to unreasonably withhold its consent to the R-Net Settlement Agreement and refused to make payment of the settlement amount or any portion thereof. As a result, and in furtherance of his

---

[1] The Bankruptcy Court also approved the R-Net Settlement Agreement after notice and a hearing in R-Net's bankruptcy cases.

confirmed Plan, the Trustee commenced this action to recover the amount of the

settlement under the Genesis Policy.

## ARGUMENT

## I.    THE AUGUST 7 ORDER IS NOT A FINAL ORDER.

Endeavoring to argue that the August 7 Order is final, which it is not,

Genesis improperly relies upon cases that generally measure finality more broadly in

bankruptcy matters than in general civil litigation.  *See Clark v. First State Bank (In re*

*White Beauty View, Inc.)*, 841 F.2d 524, 526 (3d Cir. 1988).  But this is an adversary

proceeding and "[a]dversary proceedings are merely federal civil actions under another

name, and do not ordinarily present the types of uncertainties that necessitate 'flexible

finality' analysis."  *Belli v. Temkin (In re Belli)*, 268 B.R. 851, 854 (9th Cir. B.A.P.

2001).  Accordingly, the Third Circuit has held that in assessing the finality of a

bankruptcy court order adjudicating a specific adversary proceeding, the Court should

"apply the same concepts of appealibility as those used in general civil litigation."

*Natale v. French & Pickering Creeks Conservation Trust, Inc. (In re Natale)*, 295 F.3d

375, 377 (3d Cir. 2002) (*quoting White Beauty View, Inc.*, 841 F.2d at 526).  *See also*

*Murphy v. Sec. Investor Protection Corp.,* No. 05-2311, 2005 U. S. Dist. LEXIS 23769 at

11 (E.D. Pa. Oct. 14, 2005) (holding that "[w]hen dealing with an appeal of an adversary

proceeding, a court should apply same concepts of appealibility as in general civil

litigation"); *Basher v. U.S. (In re Basher)*, 301 B.R. 175, 178 (Bankr. E.D. Pa. 2003).

Under general civil litigation principles, it is well-settled that a final

judgment by a court ends the litigation on the merits and leaves nothing further for the

court to do, but execute the judgment.  *Lauro Lines S.R.L. v. Chasser, et al.*, 490 U.S.

495, 497 (1989); *In re Del. and Hudson Ry. Co.*, 96 B.R. 469, 471 (D. Del. 1989).  Since

an order denying a motion to dismiss on jurisdictional grounds does not end the litigation,

it is not immediately reviewable.  *Catlin, et al. v. U.S.*, 324 U.S. 229, 236 (1945) (holding

that "denial of a motion to dismiss, even when the motion is based upon jurisdictional

grounds, is not immediately reviewable").  *See also Harrison v. Nissan Motor Corp. in*

*U.S.A.,* 111 F.3d 343, 347 (3d Cir. 1997) ("[t]he denial of a motion to dismiss for lack of

subject matter jurisdiction is not appealable."); *Stubbe v. Bonco Cent. Corp. (In re*

*Empresas Noroeste, Inc.)*, 806 F.2d 315, 317 (1st Cir. 1986) (holding that a bankruptcy

court order denying a motion to dismiss complaint in an adversary proceeding is not a

final order because it is "merely the end of a preliminary bout"); *Ablitt & Caruolo, P.C.*

*v. Michaud*, No. 05-cv-391-PB, 2006 U.S. Dist. LEXIS 43840 at 2 (D.N.H. Jun. 27,

2006) (stating that "[a] bankruptcy court's denial of a motion to dismiss an adversary

proceeding is not a final judgment"); *McGowan v. Global Indus., Inc. (In re Nat'l Office*

*Prod., Inc.)*, 116 B.R. 19, 20 (D.R.I. 1990) (holding that the denial of a motion to dismiss

a preference case "represents the antithesis of a 'final' order").

       The prerequisite of a final order for appeal serves as the bedrock of

appellate litigation, which requires "that a party must ordinarily raise all claims of error

in a single appeal following final judgment on the merits."  *Firestone Tire and Rubber*

*Co. v. Risjord,* 449 U.S. 368, 374 (1981).  This rule advances a number of important

principles, which, if Genesis' motion was granted, would be violated.  First, "[i]t

emphasizes the deference that appellate courts owe to the trial judge as the individual

initially called upon to decide the many questions of law and fact that occur in the course

of a trial."  *Id.*  Second,  it avoids "the obstruction to just claims that would come from

permitting the harassment and cost of a succession of separate appeals from the various rulings to which litigation may give rise, from its initiation to entry of judgment." *Id.* *(quoting Cobbledic v.U.S.,* 309 U.S. 323, 325 (1940).)  Finally, it serves "the important purpose of promoting efficient judicial administration." *Id. (quoting Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 170 (1974)).

Viewed under that appropriate legal standard, the August 7 Order is simply not a final order.   Therefore, Genesis has no right of appeal under 28 U.S.C. § 158(a)(1), its motion for leave should be denied, and the appeal should be dismissed.

## II.    GENESIS SHOULD NOT BE GRANTED LEAVE TO APPEAL THE AUGUST 7 ORDER.

No circumstances (let alone exceptional circumstances) exist to justify Genesis' appeal from the Bankruptcy Court's interlocutory August 7 Order.  Appeal from an interlocutory order requires an appellant to first obtain leave of the District Court.  28 U.S.C. § 158(a).  The District Court will entertain an appeal of an interlocutory order "only where the appellant establishes exceptional circumstances justify a departure from the basic policy of postponing review until after the entry of final judgment." *Del. and Hudson Ry. Co.*, 96 B.R. at 473.  *See also Jasin v. Kunkel (In re Kunkel)*, No. 03-mc-236, 2003 U.S. Dist. LEXIS 23725 at 8 (E.D. Pa. Dec. 29, 2003); (stating that "interlocutory appeals "should be permitted sparingly"); *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 223 F.Supp.2d 16, 24 (D.D.C. 2002) (stating that interlocutory appeals are reserved for "extraordinary cases.").

Aside from the need of establishing "exceptional circumstances," the appellant must also demonstrate that both:  (a) the order at issue involves a controlling

question of law upon which there are substantial grounds for difference of opinion, and

(b) an immediate appeal from the order may materially advance the ultimate termination

of the litigation. *Dal-Tile Int'l, Inc. v. Color Tile, Inc.*, 203 B.R. 554, 557 (D. Del. 1996).

        Genesis cannot establish that there is a controlling question of law upon

which there is a substantial ground for difference of opinion. For there to be a substantial

ground for difference of opinion on an issue, "it must involve more than strong

disagreement between adversaries." *In re Ctr. for Advanced Mfg. & Tech.*, No. 05-329,

2006 U.S. Dist. LEXIS 6389 at 5 (W.D. Pa. Feb. 13, 2006). *See also Judicial Watch,*

*Inc.*, 223 F.Supp.2d at 20 ("[m]ere disagreement, even if vehement, with a court's ruling

on a motion to dismiss does not establish a 'substantial ground for difference of opinion'

sufficient to satisfy the statutory requirements for an interlocutory appeal."). Rather, to

overcome the "strong congressional policy against piecemeal reviews," which rarely

occurs, the "requisite difference of opinion exists only where the issue is difficult and is

of first impression." *Ctr. for Advanced Mfg. & Tech.*, 2006 U.S. Dist. LEXIS 6389 at 5-6

(*citing Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990)). *See also*

*Gaylord Entertainment Co. v. Gilmore Entertainment Group, LLC.*, 187 F.Supp.2d 926,

956 (M.D. Tenn. 1999). Here, there is no substantial ground for difference of opinion

because the Bankruptcy Court carefully applied undisputed facts to the well-settled law

of this Circuit and was "convinced" that the Trustee's claims were "related to" the

Debtors' Chapter 11 cases sufficiently to confer jurisdiction under 28 U.S.C. § 157. *See*

*Eastern Airlines, Inc. v. Brown & Williams Tobacco Corp. (In re Ionosphere Clubs, Inc.)*,

No. 89 B 10448 (BRL), 1999 U.S. Dist. LEXIS 14316 at 12 (S.D.N.Y. Sep. 14, 1999)

(interlocutory appeal of bankruptcy court order finding post-confirmation jurisdiction

over adversary proceedings where "although defendants have certainly demonstrated that they disagree" with the bankruptcy court's determination, the bankruptcy court applied "well-settled precedent.")

Moreover, in determining that it had "related to" jurisdiction, the Bankruptcy Court noted a number of undisputed facts that clearly distinguished this case from the Third Circuit's decision in *Resorts Int'l, Inc.*, upon which Genesis relied. Specifically, the Bankruptcy Court noted:

> This case is distinguishable from those, and particularly the underlying Resorts case, which have held that post-confirmation litigation is not subject to the Court's subject matter jurisdiction. In this case I do find under the Resorts case that there is a close nexus to the court's jurisdiction in administering the confirmed plan. I think it's significant that in this case there is a Chapter 11 Trustee and subject matter jurisdiction does not depend on the identity of the parties, but the Resorts case made a point of noting that there was no longer any estate or estate representative.
>
> In this case there is an estate and an estate representative rather than a litigation trust. In this case the Creditors still exist and still are looking for a distribution under the auspices of the Plan and the Bankruptcy Code. There will not be limitless litigation, which was the fear of the Third Circuit in Resorts, because this is a pre or at least a confirmation claim, so any statute of limitations would run off the confirmation date. This is not a post confirmation cause of action as was the case in the Resorts.

(Hrg. Tr., 15-16.) Interlocutory appeals are not permitted where the order appealed from involves factual determinations because there is no "controlling issue of law." *See In re Neshaminy Office Bldg. Assoc.*, 81 B.R. 301, 303 (E.D. Pa. 1987). Since determinations of "related to" jurisdiction under 28 U.S.C. § 1334(b) – such as that made by the Bankruptcy Court here – require the examination of the "nature of the connection"

12

between the litigation and the bankruptcy and involve an analysis of facts as well as legal

principles, they do not constitute "controlling questions of law" for interlocutory appeal

purposes. *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 U.S. Dist.

LEXIS 22718 (S.D.N.Y. Dec. 17, 2003).

   Finally, Genesis has not demonstrated that its appeal will materially

advance the ultimate termination of the litigation. To the contrary, an appeal of the

Bankruptcy Court's decision will delay for many months the progress of this case to

dispositive motions or trial on the merits. *See Mikes v. Straus*, 939 F. Supp. 301, 302

(S.D.N.Y. 1996) (interlocutory appeal of order denying motion to dismiss on subject

matter jurisdiction grounds not warranted where an immediate appeal would further

protract resolution of the case); *Huberman v. Duane Fellows, Inc.*, No, 87 Civ 8573

(PKL), 1989 U.S. Dist. LEXIS 15329 at 3 (S.D.N.Y. Dec. 27, 1989) ("[i]t is most

expeditious for liability to be determined, or the case to be settled, before interlocutory

appeals of uncertain merit are taken").

   Equally unpersuasive is Genesis' argument that a need for further

proceedings in the bankruptcy court would be obviated if this Court reverses the

Bankruptcy Court's August 7 Order. Courts routinely reject this argument when leave to

appeal is sought from an order denying a motion to dismiss or a motion for summary

judgment. For example, in *In re Magic Restaurants, Inc.*, the District Court denied that

debtor's motion for leave to appeal a bankruptcy court order denying summary judgment

in an adversary proceeding. 202 B.R. 24, 25 (D. Del. 1996). The District Court

explained that, although the debtor "asserts that determining this issue now would save

time and avoid having to resolve other factual and legal matters, [the debtor] has not

sufficiently established an urgency that sets this case apart from the typical case." *Id.* at 26. *See also Caraballo-Seda, et al. v. Mun. of Hormigueros, et al.*, 395 F.3d 7, 9 (1st Cir. 2005) (stating "[a]s a general rule, we do not grant interlocutory appeals from a denial of a motion to dismiss").

Genesis has not established any circumstances, let alone any exceptional circumstances, to justify leave to appeal the Bankruptcy Court's interlocutory order. As a result, Genesis's motion should be denied and the appeal should be dismissed.

**III.    THE COURT SHOULD DISMISS THE APPEAL.**

The August 7 Order is not a final order. Furthermore, for the reasons set forth above, Genesis cannot demonstrate exceptional circumstances warranting leave to take an immediate appeal. Genesis is unable to show that the Bankruptcy Court's August 7 Order involves a controlling question of law upon which there is substantial ground for difference of opinion. Nor will an immediate appeal materially advance the ultimate termination of the case. Consequently, the Court should dismiss the appeal.

## CONCLUSION

For all of the foregoing reasons, the Trustee respectfully requests that the Court enter an Order (i) denying the Motion of Genesis Insurance Company for Leave to Appeal, (ii) dismissing the appeal of Genesis Insurance Company from the August 7 Order; and (iii) granting such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

Dated:  September 18, 2006

By:   /s/ Michael J. Barrie
     Richard A. Barkasy (#4683)
     Michael J. Barrie (#4684)
     SCHNADER HARRISON SEGAL
        & LEWIS LLP
     824 N. Market Street, Suite 1001
     Wilmington, DE  19801
     (302) 888-4554

     And

     Barry E. Bressler
     Wilbur L. Kipnes
     SCHNADER HARRISON SEGAL
        & LEWIS LLP
     1600 Market Street, Suite 3600
     Philadelphia, PA, 19103-7286
     (215) 751-2000

     Attorneys for Plaintiff,
     Arlin M. Adams, as Chapter 11 Trustee of
     the Bankruptcy Estates of Coram Healthcare
     Corp. and Coram, Inc.

# EXHIBIT A

                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

IN RE:                         . Case No. 00-3299(MFW)
                               .
                               .
                               . (Jointly Administered)
CORAM HEALTHCARE CORP. and     .
CORAM, INC.,                   .
                               .
                               .
              Debtors.         .
. . . . . . . . . . . . . . . .
ARLIN M. ADAMS, Chapter 11     . Adv. Proc. No. 06-50639(MFW)
Trustee of the Bankruptcy      .
Estates of Coram Healthcare    .
Corp. and Coram, Inc.,         .
                               . 824 Market Street
              Plaintiff,       . Wilmington, Delaware 19801
                               .
         vs.                   .
                               .
GENESIS INSURANCE COMPANY,     . July 25, 2006
                               . 3:59 p.m.
              Defendant.       .
. . . . . . . . . . . . . . . .

                       TRANSCRIPT OF HEARING
          BEFORE HONORABLE MARY F. WALRATH, CHIEF JUDGE
                 UNITED STATES BANKRUPTCY COURT

APPEARANCES:

For the Chapter 11 Trustee:   Schnader Harrison Segal & Lewis,
                               LLP
                              By: BARRY E. BRESSLER, ESQ.
                                  RICHARD BARKASY, ESQ.
                              1600 Market Street
                              Suite 3600
                              Philadelphia, PA  19103


Audio Operator:               Brandon McCarthy


 Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

2

APPEARANCES (Cont'd.):


For Genesis Insurance Co.:      Rosenthal, Monhait &  Goddess,
                                   P.A.
                                By:  CARMELLA P. KEENER, ESQ.
                                919 Market Street
                                Suite 1402
                                P.O. Box 1070
                                Wilmington, DE 19899

                                Thompson, Loss & Judge LLP
                                By:  THOMAS J. JUDGE, ESQ.
                                1919 Pennsylvania Avenue NW
                                Suite M-200
                                Washington, DC  20006

3

1          THE CLERK:  All rise.  You may be seated.

2          THE COURT:  Good afternoon.

3          ALL:  Good afternoon, Your Honor.

4          MS. KEENER:  Good afternoon, Your Honor.  May it

5   please the Court.  Carmella Keener of Rosenthal, Monhait, and

6   Goddess on behalf of Genesis Insurance Company.  I rise simply

7   to reintroduce to the Court my co-counsel Thomas Judge.

8          THE COURT:  All right.  Good morning.  Good

9   afternoon.

10          MR. JUDGE:  Good afternoon, Your Honor.  Tom Judge on

11  behalf of the defendant Genesis Insurance Company.  We're here

12  this afternoon on my client's motion to dismiss for lack of

13  subject matter jurisdiction.  We believe that this case should

14  be dismissed, because now post-confirmation for Coram the

15  Court's subject matter jurisdiction is appropriately and

16  necessarily restricted to matters that are necessarily linked

17  to the implementation and execution and consummation of the

18  bankruptcy plan, and that's not -- this case is not that case.

19          The Trustee has responded essentially, and it's

20  trying to take the Court's holding in AstroPower as an

21  invitation to expand the Court's subject matter statutory

22  jurisdiction in a way that we believe is inappropriate.

23  AstroPower, as I read it -- I've read it a number of times now

24  -- you know, makes it very clear and distinguishes this Court's

25  holding in Insilco where you have a situation where a trustee

4

1  is pursuing claims post-confirmation, and there is a general

2  retaining clause about the trustee be able to pursue a whole

3  wide variety of numerous unidentified claims.  That was a

4  different situation than when you addressed AstroPower where a

5  specific cause of action or cause of actions were identified as

6  to a particular set of transactions.  And, Your Honor, I, you

7  know, recognize that the creditors and the Court in approving

8  the plan had relied on the fact that there would be pursuit of

9  those claims and approval of the plan.  It was part and core of

10 the plan.

11      Here we have a situation more like Insilco where you

12 have a general retainer clause.  There are -- the Trustee's

13 empowered to pursue various causes of action.  There are in the

14 plan for Coram specifically identified causes of action that

15 were part of the plan.  They involve claims against

16 PriceWaterhouse and claims against Coram's former directors and

17 officers.  This claim against the Genesis Insurance Company was

18 not identified.  It was not part of the plan.  It was not

19 something that creditors were voting on and expecting the

20 estate to pursue, and indeed, as highlighted by the Trustee in

21 their brief, the claim didn't even accrue until after the plan

22 was confirmed.

23      THE COURT:  Well, I think they say accrued when the

24 plan was confirmed.

25      MR. JUDGE:  Well, you would have to have the

5

1  approval, and once the approval occurs, then the settlement is

2  finalized.  But be that as it may, the bottom line is that when

3  the plan was being approved, there was no plea to the creditors

4  or explanation to the creditors that there was going to be a

5  recovery against Genesis Insurance Company in connection with

6  the Arnett settlement.  That was not part and parcel of the

7  plan's approval, and that being the case, this case is too

8  attenuated to be part of the Court's subject matter

9  jurisdiction.

10            THE COURT:  All right.  I understand the argument.

11            MR. JUDGE:  Thank you, Your Honor.

12            MR. BARKASY:  Your Honor, Richard Barkasy from

13  Schnader, Harrison, Segal, and Lewis for the Chapter 11

14  Trustee, Arlin Adams.  Your Honor, the <u>Resorts</u> test for related

15  to jurisdiction is whether there was a close nexus between the

16  action and the bankruptcy plan or proceeding.  In the <u>Bank of</u>

17  <u>America</u> case Judge Farnan called that a broad interpretation

18  related to jurisdiction.  We believe -- the Trustee believes

19  that there's a close nexus here for several reasons.

20            First, the claim -- unlike in some of the cases being

21  cited and relied upon by Genesis, the claim is brought by a

22  Chapter 11 Trustee appointed under the Bankruptcy Code and

23  operating under the terms of the Bankruptcy Code.  It's not

24  being brought by a private litigation trust.  Unlike some of

25  the cases relied upon by Genesis, unlike in <u>Resorts</u>, the

6

creditors here have not exchanged their claims for interests in

a litigation trust.  The creditors remain creditors.  As Your

Honor's confirmation order specifically provides and the plan

specifically provides, the Trustee is maintaining the causes of

action as defined in the plan and in the confirmation order on

behalf of the debtors' estate.  There is still an estate that's

being administered here by a Trustee.  It's not a private

litigation trust, and the creditors have not relinquished their

claims to the estate.

As the confirmation order provides and the plan

provides, the Trustee is the sole party authorized to bring the

cause of action, to compromise them, and to seek Bankruptcy

Court approval of the settlements.  Consistent with that

language, the extent that the Trustee has entered into

settlements post-confirmation, he has come to the Court and

requested Bankruptcy Court approval.  We think those things

create in and of themselves a close nexus.

There's also certainly a logical connection -- a

logical, factual connection between the claim here asserted by

the Trustee against Genesis and the Chapter 11 case and plan.

The Trustee is seeking reimbursement for the amount paid by the

estate to the Arnett bankruptcy estate in accordance with the

Arnett settlement agreement that was approved as part of the

confirmation of the Chapter 11 Trustee's plan of reorganization

in the core matter.

7

1          The -- Genesis -- as Genesis says in its opening

2   brief, it asserts that the Trustee's claim is barred by the

3   provisions of the policy that require written consent to any

4   settlement on behalf of Genesis.  That policy provision also

5   provides that consent cannot be unreasonably withheld.  It's

6   the Trustee's position that Genesis is not entitled to withhold

7   consent to a reasonable settlement, otherwise, it is

8   unreasonably withholding consent.  There will be in this

9   litigation, therefore, arguments made.  I think there's no

10  question that there will be arguments made about the

11  reasonableness of the settlement, about the impact of the

12  Court's prior ruling approving the settlement on the

13  reasonableness determination made by Genesis.

14          Here there is a close factual connection in many ways

15  between the Trustee's cause and the plan.  It's not much

16  different.  Of course, there's also a connection, because the

17  money that's recovered here is going to be paid to creditors in

18  the first instance to satisfy their claims of post-petition

19  interest.  At this point in the case it's not that much

20  different a posture than the case was in in the Mobile Tool --

21  Your Honor's Mobile Tool decision where you had a converted

22  Chapter 11, and you had a trustee engage in a declaratory

23  judgment action with Great American Insurance Company, and Your

24  Honor held that it was related to jurisdiction, because there

25  would be an impact on the estate, because there was certainly a

8

1  relationship between what insurance coverage there would be and

2  how much money there would be in the estate to distribute.

3          That is really what exists right now even though

4  we're post-confirmation.  We have a trustee.  We have

5  creditors.  We have a claim that's specifically authorized by

6  the plan for the Trustee to make on behalf of those creditors

7  the same reasoning and logic the Trustee believes holds true

8  here.  All of those things when added together, we believe,

9  create a sufficiently close nexus for the Trustee's action to

10  be related to the Chapter 11 case.

11          THE COURT:  All right.  I understand your argument.

12          MR. JUDGE:  Your Honor, at bottom what I hear is a

13  contention that if a recovery is had against Genesis, since

14  this will benefit creditors ultimately, this creates subject

15  matter jurisdiction, and the case law is very clear that that's

16  not a determinative factor in determining whether this actually

17  is a necessary link to the consummation and implementation and

18  execution of the confirmed plan.

19          THE COURT:  Well, that was one I guess distinguishing

20  feature in the Resorts case, and I don't know why the Third

21  Circuit referred to it, but they did refer to it in the course

22  of their determining whether there was a nexus, and that was

23  that there weren't even creditors left anymore.  They had

24  exchanged their interests for shares in the litigation trust.

25          MR. JUDGE:  That's right, Your Honor, but since then

9

1  other courts have indicated -- and we cite two in our brief.

2  And I --

3          THE COURT:  That is not enough that you're going to

4  get more money to distribute.  I understand.

5          MR. JUDGE:  Exactly, and --

6          THE COURT:  That would cover all lawsuits I guess.

7          MR. JUDGE:  Right.  And, really, the way the Trustee

8  has framed this, by virtue of his position as a Chapter 11

9  Trustee, any and all the claims that he had as blanket sort of

10 authorization to pursue automatically are subject to this

11 Court's jurisdiction.  And frankly, as I interpret the case

12 law, that is not supposed to be the case.  The fact that he has

13 assigned general causes of action arising pre-petition that he

14 can pursue on behalf of the estate does not mean that those

15 claims are necessarily linked to the consummation and execution

16 and interpretation of the bankruptcy plan.

17         THE COURT:  Well, I don't think it needs to be

18 related to interpretation or consummation.  Well, consummation

19 of the plan perhaps.  But isn't it significant that we have a

20 Chapter 11 Trustee here rather than a litigation trust,

21 especially because in most litigation trusts the agreements

22 provide that they can do all sorts of things?  Whereas, a

23 Chapter 11 Trustee has certain specified duties identified in

24 the Bankruptcy Code that all relate to administration of the

25 estate.

1          MR. JUDGE:  I don't see how that status somehow

2    creates a problem for the management of the estate.  The

3    Trustee has his duties and obligations in pursuing these causes

4    of action and how he pursues them are dictated by the Code, but

5    that doesn't make this claim -- this state law claim for

6    insurance coverage somehow part and parcel of the bankruptcy

7    plan or provide a close nexus to the bankruptcy plan.

8          THE COURT:  Well, or subject to the subject matter

9    jurisdiction of the Court.

10          MR. JUDGE:  I guess what I'm saying, Your Honor, is

11    the fact that he's a trustee should not create subject matter

12    jurisdiction for the Court.  That in itself and by itself

13    should not be a factor that creates subject matter

14    jurisdiction.  We have a state law claim for insurance coverage

15    that has no bearing on the plan whatsoever.  The settlement

16    that they referred to -- the underlying settlement is already

17    paid.  There's no reference in the plan to obtain reimbursement

18    from anybody but on Genesis Insurance Company.  It neither --

19    it doesn't affect the consummation of the plan and the fact

20    that there's a Chapter 11 Trustee rather than a litigation

21    trustee, and whatever their obligations or guidelines are at

22    any given moment should not affect whether this actually

23    requires -- you know, is going to affect the implementation of

24    the plan or affect the consummation of the plan.  There's not

25    -- I mean, otherwise, any automobile insurance case, any other

11

1  case where the Trustee might recover money on behalf of the

2  estate would be covered under this Court's subject matter

3  jurisdiction after the plan is confirmed, and, frankly, I just

4  don't see how <u>International Resorts</u> or, you know, decisions

5  from this Court and other courts really can be reconciled with

6  that position.

7         THE COURT:  Well, but the Third Circuit did make a

8  point of the fact that while the reorganized debtor is off

9  doing his own thing, and this really doesn't affect the estate,

10  because there isn't an estate left, if you will.  But in this

11  case there is an estate left.

12         MR. JUDGE:  There's still an estate in terms of

13  there's not a private litigation trust.  The reorganized debtor

14  is up and operating and carrying on.  The recovery -- instead

15  of having the creditors assumed within a trust, they're just

16  there part of the estate.  But it doesn't require -- again, the

17  only thing that's happening here, the plan is not being

18  implemented.  There's not going to be a holdup in the

19  implementation of the plan if this case doesn't -- if this

20  Court doesn't have jurisdiction over the case, or this case

21  doesn't resolve or isn't even pursued.  The plan will go

22  forward as is, and the only benefit being derived here to the

23  estate, as noted in other cases, is the creditors may have more

24  money for the estate.  That doesn't create subject matter

25  jurisdiction.

12

1          THE COURT:  Okay.  Any reply?  I'm sorry.  Anything

2  further?

3          MR. JUDGE:  Well, I just -- the Trustee has pursued

4  other claims, including the claim that was marked out in the

5  plan against the former directors and officers.  That's in

6  District Court.  Why does this case have to be in Bankruptcy

7  Court?  There's really no -- it's an insurance coverage claim.

8  It turns on the policy, and their argument -- very speculative

9  argument about what's going to be entailed in the defense by

10 Genesis that's going to implicate this court.  Well, I very

11 strongly disagree that we have anything to say that anything

12 this Court has done in the bankruptcy proceedings to respond to

13 this claim for coverage.  It's a state law claim for coverage,

14 and there either is or is not coverage under the policy.  It

15 doesn't turn on bankruptcy law, and it doesn't turn on any

16 decision by this Court.

17         THE COURT:  Well, I think they would argue that on

18 the issue of whether or not you reasonably withheld your

19 consent, the fact that the settlement itself was determined to

20 be reasonable as part of the confirmation does impact on that

21 ruling.

22         MR. JUDGE:  Well, I guess if they're suggesting --

23 and I don't think in good faith they can -- that Your Honor,

24 when you approved the Arnett settlement, was thinking that the

25 settlement was reasonable from the perspective of the insured

13

1 directors and officers and from their insurance company.  You

2 know, I don't think anybody can dispute -- that's not an issue

3 that was presented before Your Honor.  The issue presented

4 before Your Honor was whether the Arnett settlement was fair

5 and reasonable from the standpoint of the bankruptcy estate.

6 Was enough being paid?

7          Not to go too far into the details of this case, but

8 essentially -- I mean part of the problem that the Trustee

9 faces is that the claim that Arnett was pursuing was not just a

10 claim against the -- their directors and officers at Coram.

11 There were other claims that had no bearing or no coverage

12 implications under our policy.  This Court was not asked to

13 make a coverage determination when it approved this settlement.

14 The Court was asked to do something relatively simple, but it

15 was important, and it did a, you know, careful analysis whether

16 the settlement was fair and reasonable from the standpoint of

17 the Coram estates.  Were the creditors -- was the estate

18 receiving enough consideration in resolving its claim, because

19 it had affirmative claims against the Arnett subsidiaries?

20          Likewise, the Bankruptcy Court for the Arnett

21 subsidiaries approved the settlement as fair and reasonable

22 from the standpoint if the Arnett estates.  There's no

23 resolution of the insurance coverage issues.  Those issues are

24 still open to be  resolved.  That's why they brought a suit.

25          MR. BARKASY:  Your Honor, I think all of the cases

14

1  relied upon by Genesis involve litigation trusts.  The Third

2  Circuit in <u>Resorts</u> specifically addressed the situation there

3  where you had a litigation -- private litigation trust paid

4  under a plan, a litigation Trustee, and creditors who had

5  specifically relinquished their claims against the estate,

6  specifically discussed that there was no longer an estate

7  making a distinguishing pre-confirmation and post-confirmation

8  situation.

9          The Court said that it was concerned with the spector

10 of unending jurisdiction over continuing trusts.  This case is

11 clearly different for those reasons.  We have a Chapter 11

12 Trustee.  We have an estate.  We have creditors.  With regard

13 to whether there's a factual -- going to -- there's a logical,

14 factual connection, as one case that we cited talked about.  I

15 think you can't deny that there's some logical, factual

16 connection.  We're talking about a settlement that was approved

17 in the bankruptcy case.  But, moreover, I think there's no

18 question that there are going to be issues in the case related

19 to the proceedings to approve the settlement.  It will

20 certainly be the Trustee's position that it is unreasonable for

21 Genesis to take a position that there is no coverage -- zero

22 coverage for this claim, nothing at all, because there was no

23 consent.  And the Trustee is going to take the position clearly

24 that one of the factors -- at a minimum one of the factors that

25 Genesis should've considered was that a court heard significant

15

1   testimony during the confirmation hearing and parties who sat

2   in a similar position to Genesis, creditors and shareholders,

3   shareholders who were represented by, as I recall, a very

4   active equity committee who stood in a very similar position,

5   and whether or not it was reasonable under -- for Genesis under

6   those circumstances to deny coverage.  I think there's clear,

7   factual relationship.

8           Will it ultimately be determinative?  I don't know,

9   but I think over and above the fact that we're dealing with a

10  Chapter 11 Trustee, the fact that the Trustee is bringing the

11  claim under the confirmation order on behalf of the estate, the

12  fact that proceeds are going to go to creditors if they're

13  recovered, the fact the Trustee is going to come to the

14  Bankruptcy Court to seek approval of any compromise of the case

15  combined with the close, factual connection between the case

16  and the bankruptcy case create in this matter -- and I don't

17  know in every matter, but in this matter create a significant

18  -- a significantly -- a substantially close nexus between the

19  bankruptcy case and the Trustee's claim.  Thank you, Your

20  Honor.

21          THE COURT:  All right.  Well, it is a close case, but

22  I am convinced that the Trustee is correct.  This case is

23  distinguishable from those, and particularly the Resorts case,

24  which have held that post-confirmation litigation is not

25  subject to the Court's subject matter jurisdiction.  In this

16

1  case I do find under the <u>Resorts</u> case that there is a close

2  nexus to the Court's jurisdiction in administering the

3  confirmed plan.  I think it's significant that in this case

4  there is a Chapter 11 Trustee, and subject matter jurisdiction

5  does not depend on the identity of the parties, but the <u>Resorts</u>

6  case made a point of noting that there was no longer any estate

7  or estate representative.

8         In this case there is an estate and an estate

9  representative rather than a litigation trust.  In this case

10 the creditors still exist and still are looking for a

11 distribution under the auspices of the plan and the Bankruptcy

12 Code.  There will not be limitless litigation, which was the

13 fear of the Third Circuit in <u>Resorts</u>, because this is a pre- --

14 or at least a confirmation claim, so any statute of limitations

15 would run off the confirmation date.  This is not a post-

16 confirmation cause of action as was the case in <u>Resorts</u>.

17        While I agree generally with the courts that have

18 held that post-confirmation jurisdiction should generally be

19 limited to causes of action specifically identified in a plan,

20 I think in this case the fact that this cause of action does

21 have a relationship to a settlement which was permanently

22 identified in the plan and disclosure statement gives it a

23 close enough nexus.  It is not, if you will, a cause of action

24 that just comes out of the blue.

25        So I think there's a close enough nexus to the plan

17

1  and confirmation order to provide that the Court has

2  jurisdiction over this cause of action, so I will deny the

3  motion to dismiss on that basis.

4          MR. JUDGE:  Your Honor, could we get a ruling?  There

5  was argument about whether this was a core or non-core

6  proceeding.

7          THE COURT:  I didn't hear argument on that point,

8  but --

9          MR. JUDGE:  I'm sorry.  We did not raise argument on

10 that point, because it was not necessary to the -- related to

11 the argument, but in both briefs --

12         THE COURT:  Well, it's a related to.  It's not a --

13 obviously, it doesn't arise under Chapter 11.  I think we've

14 limited it to the related to jurisdiction aspect.

15         MR. BARKASY:  Your Honor, we assumed that your ruling

16 was based upon related to jurisdiction not that it was a core

17 proceeding.

18         MR. JUDGE:  I guess what I'm asking is if we could

19 have a -- our position is that it's a non-core proceeding.  If

20 the Trustee agrees with that, we'd like to have it on the

21 record.  If they don't agree with that, we'd like to -- if we

22 can get a ruling, since it was briefed.

23         MR. BARKASY:  Your Honor, we agree.

24         THE COURT:  All right.  All right, then can I get the

25 Trustee's counsel to submit a form of order under certification

18

1  of counsel?

2         MR. BARKASY:  Yes, Your Honor.

3         THE COURT:  Okay.

4         MR. BARKASY:  Your Honor, when we were here for the

5  initial conference in the case a few weeks ago, we had

6  discussed a schedule going forward.  We had actually reached

7  some agreements as to time frames.  What I'm suggesting is

8  should the parties get together and submit a proposed

9  scheduling stipulation and order for Your Honor?

10        THE COURT:  I think so.  The parties can work that

11 out.

12        MR. JUDGE:  Yes.  Yes, Your Honor.

13        THE COURT:  All right.  All right, then we'll stand

14 adjourned.  Thank you.

15        MR. JUDGE:  Thank you, Your Honor.

16        ALL:  Thank you, Your Honor.

17                      * * * * *

18                    **CERTIFICATION**

19        I, PATRICIA C. REPKO, court approved transcriber,

20 certify that the foregoing is a correct transcript from the

21 official electronic sound recording of the proceedings in the

22 above-entitled matter to the best of my ability.

23

24 /s/ Patricia C. Repko          Date: August 16, 2006
25 PATRICIA C. REPKO
26 J&J COURT TRANSCRIBERS, INC.

                **J&J COURT TRANSCRIBERS, INC.**

# EXHIBIT B



**GENESIS** GENESIS INSURANCE COMPANY
STAMFORD, CONNECTICUT 06904

COMMERCIAL LINES POLICY

THIS POLICY JACKET WITH THE COMMON DECLARATIONS PAGE, COVERAGE PARTS,
AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETES THIS POLICY.

# GENESIS GENESIS INSURANCE COMPANY

### DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY
### DECLARATIONS PAGE

Policy Number: YXB001625A

NOTE: THIS IS A CLAIMS MADE POLICY, PLEASE READ IT CAREFULLY. AMOUNTS INCURRED AS DEFENSE COSTS SHALL REDUCE THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS AND SHALL ALSO BE APPLIED AGAINST THE RETENTION. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND THOSE INSURED UNDER THIS POLICY.

### THIS IS A CLAIMS MADE POLICY, PLEASE READ IT CAREFULLY

**ITEM 1.** Insured Entity.......:  **Coram Healthcare Corporation**
Principal Office....: 1125 Seventeenth Street, Suite 2100
Denver, CO 80202

**ITEM 2.** Policy Period........: From: January 8, 1999    To: January 8, 2001
(Both dates at 12:01 a.m. at the Principal Address of the Insured Entity)

**ITEM 3.** Limit of Liability (Inclusive of Defense Costs):
$ 25,000,000    Aggregate Limit of Liability

**ITEM 4.** Retentions Applicable to Insuring Agreements:
A.  For Securities Claims:
1.  Defense Costs:
$              0  Each Director or Officer for each single Securities Claim under Insuring Agreement Section I.A., and in no event exceeding
$              0  for all Directors and Officers under Insuring Agreement Section I.A. for each single Securities Claim; and
$        200,000  for each single Securities Claim to which Insuring Agreements Sections I.B. or I.C. apply.
2.  Settlements and Judgments:
NONE  for Settlements and Judgments in Securities Claims.

B.  For Claims other than Securities Claims:
$              0  Each Director or Officer for each single Claim under Insuring Agreement Section I.A., and in no event exceeding
$              0  for all Directors and Officers under Insuring Agreement Section I.A. for each single Claim; and
$         75,000  for each single Claim to which Insuring Agreement Section I.B. applies.

**ITEM 5.** Premium:
$       586,000  Two year pre-paid premium.

**ITEM 6.** Premium for Discovery Period:
75% of the annualized premium, to be paid only if the eligibility requirements are met and the Discovery Period option is properly exercised

**ITEM 7.** Endorsements:
This Policy includes the following attached endorsements, and all other endorsements issued by the Insurer to be attached hereto after the issuance of this Policy: 7425.EP, 7425, 7425.RE, 7469.

**ITEM 8.** Notices and Information:
All notices and information required to be provided to the Insurer under this Policy shall be addressed to: Genesis Insurance Company, 25550 Chagrin Boulevard, Suite 300, Beachwood, Ohio 44122.

These Declarations along with the Application, including all materials submitted therewith, and the Directors and Officers Liability Insurance Policy, shall constitute the entire contract between the Directors, Officers, the Company and the Insurer. GENESIS INSURANCE COMPANY.

Date: January 8, 1999                  By: *Michael Zartman*
_____
Company Officer or Authorized Agent

FORM NO. GIC-7417 (3/97)

# GENESIS

**GENESIS INSURANCE COMPANY**

## DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

### THIS IS A CLAIMS MADE POLICY, PLEASE READ IT CAREFULLY

In consideration of the premium paid and in reliance upon the information provided in and with the Application, and subject to the terms, conditions and limitations of this Policy, the Insurer, the Company and the Directors and Officers agree as follows:

## SECTION I.  INSURING AGREEMENTS

A.  The Insurer will pay, on behalf of the Directors and Officers, Loss arising from Claims first made during the Policy (or Discovery) Period against the Directors or Officers, individually or collectively, for a Wrongful Act, except for such Loss which the Company pays to or on behalf of the Directors and Officers;

B.  The Insurer will pay, on behalf of the Company, Loss which the Company is required to indemnify, or which the Company may legally indemnify, the Directors or Officers, arising from Claims first made during the Policy (or Discovery) Period against the Directors or Officers, individually or collectively, for a Wrongful Act; and

C.  The Insurer will pay, on behalf of the Company, Loss arising from Securities Claims first made against the Company during the Policy (or Discovery) Period for a Wrongful Act.

## SECTION II.  DEFINITIONS

A.  "Claim" shall mean the following proceedings initiated against a Director or Officer for money damages or other relief, whether brought within or outside of the United States:

(1)  any civil, arbitration or administrative proceeding commenced by: (a) service of a complaint or similar pleading, or (b) receipt of a notice of charges;
(2)  any criminal proceeding commenced by the return of an indictment or an information;
(3)  any appeal from the above proceedings; or
(4)  other written or verbal demand for money or services.

"Claim" shall also mean any of the above-listed proceedings initiated against a Director, Officer or the Company which is a Securities Claim.

B.  "Company" shall mean the Insured Entity and its Subsidiaries under Insuring Agreements Sections I.A. and I.B. Under Insuring Agreement Section I.C., "Company" shall mean the Insured Entity only.

C.  "Defense Costs" shall mean reasonable and necessary legal fees and expenses incurred in the investigation and/or defense of any Claim, including costs of attachment or similar bonds; provided, however, Defense Costs shall not include salaries, wages, overhead or benefit expenses of or associated with Directors, Officers, employees of the Company, or the Company.

D.  "Determination of No Liability" shall mean: (1) a final judgment of no liability in a Securities Claim in favor of all Directors and Officers and the Company, after the exhaustion of all appeals, or (2) a dismissal of a Securities Claim without prejudice, and without the payment of any consideration by the Directors, Officers, and/or the Company.

Form No. GIC-7418 (9/97)
page 1 of 8

E. "Directors" and "Officers" shall mean:

   (1) all past, current or prospective duly elected or appointed directors and officers of the Company, and their foreign equivalents for Company operations outside of the United States, including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy;

   (2) for Securities Claims only, all past, current and future employees of the Company; and

   (3) spouses of duly elected or appointed directors and officers of the Company, but only for Claims

      (i) which are based upon Wrongful Acts of the directors or officers, and not upon any alleged conduct of a spouse, and

      (ii) which are based upon either the legal status as a spouse or the joint ownership of property between a spouse and a director or officer.

F. "Loss" shall mean any amounts which the Directors or Officers are legally obligated to pay, such amounts which the Company is required to indemnify the Directors or Officers, or such amounts which the Company may legally indemnify the Directors or Officers, for Claims made against the Directors or Officers, or any amounts which the Company is legally obligated to pay for Securities Claims made against the Company, in excess of the applicable Retention, including damages, judgments, orders, Settlements, and Defense Costs; provided, however, Loss shall not include criminal or civil fines or penalties imposed by law, multiplied portions of damages in excess of actual damages, taxes, or any matter which may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

G. "Outside Entity" shall mean any nonprofit entity under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, for which any of the Directors or Officers serve as directors or officers with the consent of the Company.

H. "Policy Period" shall mean the time period from the inception date of this Policy to the expiration date as stated in Item 2 of the Declarations, or to its earlier cancellation or termination date.

I. "Securities Claim" means any Claim brought by any person or entity, directly or derivatively, based upon, arising out of, or attributable to, the purchase or sale, or offer to purchase or sell, any securities of the Company, brought by a securities holder of the Company in their capacity as a securities holder, or brought by the United States Securities and Exchange Commission.

J. "Settlement" shall mean a compromise of any Claim to which the Insurer has given its written consent pursuant to Section VI.A.

K. "Subsidiary" shall mean:

   (1) any entity in which the Insured Entity owns or at any time owned more than fifty percent (50%) of the issued and outstanding voting securities, directly or indirectly, subject to clauses (2) and (3) below for acquisitions made by the Company during the Policy Period;

   (2) any entity in which the Insured Entity acquires more than 50% of the issued and outstanding voting securities or substantially all of the assets, directly or indirectly, during the Policy Period, if such entity's total assets represent less than 20% of the Company's total assets prior to the acquisition; and

   (3) for forty-five (45) days immediately following the acquisition date, any entity in which the Insured Entity acquires more than 50% of the issued and outstanding voting securities or substantially all of the assets, directly or indirectly, during the Policy Period, if such entity's total assets represent more than 20% of the Company's total assets prior to the acquisition; provided, however, such entity will not be considered a Subsidiary or included within the definition of Company beyond such automatic forty-five (45) day period unless the Insurer specifically agrees in writing to provide such coverage, subject to such additional information, coverage terms and premium as the Insurer may require.

The term "Subsidiary" shall also include any subsidiary of a Subsidiary.

Form No. GIC-7418 (9/97)
page 2 of 8

L.  "Wrongful Act" shall mean:

    (1)  under Insuring Agreements Sections I.A. and B., any actual or alleged act, omission, misstatement, misleading statement, neglect, error or breach of duty by the Directors or Officers in their capacity as Directors or Officers of the Company or in their capacity as directors or officers of an Outside Entity, individually or collectively;

    (2)  under Insuring Agreement Section I.C., any actual or alleged act, omission, misstatement, misleading statement, neglect, error or breach of duty by the Company, or by persons for whose actual or alleged conduct the Company is legally responsible.

## SECTION III.  DISCOVERY PERIOD

A.  If either the Insurer or Insured Entity cancels this Policy pursuant to Section VIII, or if either the Insurer or Insured Entity chooses to not renew this Policy, for any reason other than the Company's nonpayment of premium or non-compliance with the terms of this Policy, then the Insured Entity shall have the right, upon payment of the additional premium set forth in Item 6 of the Declarations, to an extension of the Policy Period for Claims first made during the period of one year after the effective date of such cancellation or nonrenewal, but only with respect to Wrongful Acts committed before such effective date and otherwise covered by this Policy. This one year extension period shall be referred to as the Discovery Period.

B.  The right to purchase the Discovery Period shall terminate unless a written request for the Discovery Period is provided to the Insurer within thirty (30) days after the effective date of cancellation or nonrenewal, together with full payment of the premium for the Discovery Period.

C.  Purchase of the Discovery Period shall not in any way increase the Limit of Liability.

D.  The additional premium paid for the Discovery Period shall be fully earned at its commencement.

## SECTION IV.  EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with any Claim:

A.  Arising out of, based upon or attributable to the Directors or Officers or the Company gaining in fact any profit or advantage to which they were not legally entitled;

B.  Arising out of, based upon or attributable to the committing in fact of deliberate fraudulent, dishonest or criminal acts by the Directors or Officers, or by employees, agents or representatives of the Company;

C.  Which is insured in whole or in part by another valid policy or policies, including policies issued to an Outside Entity, regardless of whether or not any Loss arising from such Claim is collectible or recoverable under such other policy or policies; provided, however, this exclusion shall not apply to policies which are specifically excess of this Policy by reference hereto (including the Policy Number);

D.  Arising out of, based upon or in any way involving: (1) any Wrongful Act, or any fact, circumstance or situation which has been the subject of any notice given prior to the Policy Period under any insurance policy providing protection for the Directors or Officers or the Company, including any matter in any way related thereto; or (2) any other Wrongful Act which has as a common nexus any fact, circumstance, situation, event, or transaction with any fact, circumstance or situation which has been the subject of notice as described in clause (1) of this exclusion;

Form No. OIC-7418 (9/97)
page 3 of 8

E. For actual or alleged: (1) bodily injury, sickness, disease, or death of any person, assault, battery, mental anguish, emotional distress, loss of consortium; (2) damage to or destruction of any tangible property, including loss of use thereof; or (3) invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, defamation or false light, libel or slander;

F. For actual or alleged violations of the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder;

G. For any actual or alleged act, omission, misstatement, misleading statement, neglect, error or breach of duty committed in the capacity as a director or officer of any entity other than the Company or an Outside Entity;

H. Arising out of, based upon, or in any way involving, directly or indirectly:

(1) the actual, alleged or threatened discharge, disposal, migration, dispersal, release or escape of pollutants, or

(2) any direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize pollutants, or to pay for or contribute to the costs of undertaking such actions including claims alleging damage to the Company or its shareholders.

Pollutants include (but are not limited to) any solid, liquid, nuclear, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, organisms or other hazardous substances, and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

I. Brought by, at the behest of, or with the assistance or active participation of, the Insured Entity or a Subsidiary (or any affiliated person), or any Director or Officer of the Insured Entity or a Subsidiary; however, this exclusion shall not apply to wrongful termination of employment actions, shareholder derivative actions which are not brought by, at the behest of, or with the assistance or active participation of a Director or Officer of the Insured Entity or a Subsidiary, crossclaims, or to other claims for contribution or indemnity which are part of or arise directly from a Claim;

J. Arising out of, based upon, or in any way involving actual or alleged conduct in the capacity as a director, officer or employee of any Subsidiary, which actual or alleged conduct occurred prior to or after the time period when such subject entity was a Subsidiary of the Insured Entity;

K. Which is indemnified by an Outside Entity.

NOTE: THE ACTUAL OR ALLEGED CONDUCT OF ANY DIRECTOR, OFFICER OR THE COMPANY SHALL NOT BE IMPUTED TO ANY OTHER DIRECTOR OR OFFICER FOR THE PURPOSE OF DETERMINING THE APPLICABILITY OF THE ABOVE EXCLUSIONS.

---

## SECTION V.  LIMIT OF LIABILITY, RETENTIONS, ALLOCATION

A. The Insurer shall be liable to pay one hundred percent (100%) of covered Loss in excess of the applicable Retention up to the Limit of Liability stated in Item 3 of the Declarations. The Limit of Liability is the Insurer's maximum aggregate limit of liability for all Loss under all of the Insuring Agreements combined, arising out of all Claims first made during the Policy Period and Discovery Period (if applicable), regardless of the time of payment by the Insurer.

B. Defense Costs shall be part of and not in addition to the Limit of Liability, and such Defense Costs shall reduce the Limit of Liability and shall also be applied against the Retention.

C.  More than one Claim based upon or arising out of the same Wrongful Act(s), or facts, circumstances or situations, or one or more series of similar, repeated or continuous Wrongful Acts, shall be considered a single Claim, and only one Retention shall be applicable to such single Claim. Such single Claim shall be deemed to be first made on the date when the earliest Claim is first made, or on the date within the Policy Period in which notice of a potential Claim pursuant to Section VII.B. is given.

D.  One Retention amount shall apply to the covered portion of each and every single Claim. In the event a single Claim is covered under more than one Insuring Agreement, the Retentions stated in Item 4 of the Declarations shall be applied separately to the portion of the Claim covered by each Insuring Agreement, and the sum of the Retentions so applied shall constitute the Retention for each single Claim, which in total shall not exceed the largest of the applicable Retentions. Notwithstanding other Policy provisions, for purposes of determining the applicable Retention(s), the Retentions applicable to Insuring Agreement Section I.B. shall apply to Claims made against Directors or Officers, and indemnification (including advancement of defense costs) by the Company will be presumed to be required or permissible, whenever indemnification is legally permissible under the broadest applicable laws, regardless of whether the Company has agreed in its by-laws or otherwise to provide such indemnification, unless indemnification cannot be provided due to financial insolvency.

E.  Notwithstanding the foregoing provisions of Section V, the Retention(s) applicable to Securities Claims shall apply only to Defense Costs. Further, no Retention shall apply in the event of a Determination of No Liability in a Securities Claim, in which event the Insurer shall reimburse any Defense Costs paid by the Directors and Officers or the Company within the Retention amount. Such reimbursement shall be made within sixty (60) days of the Determination of No Liability, only if:

    (1)  the subject Securities Claim, or another Claim which would be treated as a single Claim with the subject Securities Claim under Section V.C., is not brought or refiled within such sixty (60) day period;

    (2)  the Determination of No Liability is not challenged by motion or appeal within such sixty (60) day period; and

    (3)  only with respect to a dismissal of or stipulation to dismiss a Securities Claim without prejudice, the Company provides a written undertaking satisfactory to the Insurer which states that such reimbursement shall be returned to the Insurer if the subject Securities Claim, or another Securities Claim which would be treated as a single Claim with the subject Securities Claim under Section V.C., is brought or refiled after the sixty (60) day period.

F.  The Company is not covered under Insuring Agreement Section I.A.; the Company is covered, subject to the Policy's terms and conditions, only with respect to indemnification of Directors or Officers under Insuring Agreement Section I.B. for Claims made against the Directors and Officers; but the Company is covered, subject to the Policy's terms and conditions, under Insuring Agreement Section I. C. for Securities Claims made against the Company. Accordingly, the Insurer has no obligation under this Policy for defense fees and costs incurred by, judgments against or settlements by the Company arising out of any Claims or other actions in which the Company is a party other than a covered Securities Claim, nor any obligation to pay any amount arising out of any legal liability that the Company has except with respect to covered Securities Claims against the Company.

G.  If both Loss covered by this Policy and other loss are incurred, either because a Claim includes both covered and non-covered matters, or because a Claim is made against both covered and non-covered parties, then the Directors, Officers, the Company and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts. In making such determination, the parties shall take into account the relative legal and financial exposures, and the relative benefits obtained in connection with the defense and/or settlement, of and between the covered and non-covered parties and matters involved in the Claim. In the event the parties cannot agree to an appropriate allocation percentage for the Claim, then the Insurer shall be obligated to make an interim payment of the amount of Loss, including Defense Costs, which the parties agree is not in dispute until a final allocation is agreed upon or determined pursuant to the terms of this Policy.

## SECTION VI.  DEFENSE COSTS AND SETTLEMENTS

A. The Directors, Officers and the Company shall not admit liability for or settle any Claim, or incur Defense Costs in connection with any Claim, without the Insurer's prior written consent, which consent shall not be unreasonably withheld. The Insurer shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent. Any Defense Costs incurred, and/or settlements or judgments agreed to prior to the Insurer's consent thereto shall not be covered by this Policy.

B. The Insurer shall, upon request, advance Defense Costs prior to the final disposition of a Claim, subject to an allocation, if any, determined in accordance with Sections V.F. and V.G., and subject further to prior satisfaction of the applicable Retention. Any agreement by the Insurer to advance Defense Costs shall be on the condition that the parties for whom the Defense Costs are advanced provide a written undertaking satisfactory to the Insurer which states that in the event it is finally established that the Insurer has no liability under the Policy to the Directors, Officers or the Company, or any of them separately, for such Claim, they agree to repay to the Insurer upon demand all Defense Costs advanced on their behalf.

C. It shall be the duty of the Directors, Officers and the Company and not the duty of the Insurer to defend Claims, and the Directors, Officers and the Company shall obtain the consent of the Insurer as to the choice of defense counsel, which consent shall not be unreasonably withheld. The Insurer shall at all times have the right, but not the duty, to associate in the investigation, defense or Settlement of any Claim that appears reasonably likely to involve the Insurer.

D. The Directors, Officers and the Company shall give the Insurer such information, assistance and cooperation as the Insurer reasonably requests, including furnishing the Insurer with copies of reports, investigations, pleadings and any other information requested by the Insurer in connection therewith.

E. The Insurer shall have the right but not the obligation to make any investigation it deems expedient with respect to a Claim and, with the consent of the Company or the person(s) against whom the Claim is made, make a Settlement within the available Limit of Liability (whether above or below the applicable Retention).

## SECTION VII.  NOTICE OF CLAIMS AND POTENTIAL CLAIMS

A. The Directors, Officers and/or the Company shall give the Insurer written notice as soon as practicable of any Claim first made during the Policy (or Discovery) Period, and in no event later than thirty (30) days after the expiration of the Policy (or Discovery) Period, and, for Claims deemed to be first made during the Policy Period under Section VII.B., within sixty (60) days from when such Claims are made.

B. If, prior to the effective date of the expiration of the Policy Period, the Directors, Officers or the Company first become aware of circumstances which may subsequently give rise to a Claim, and the Directors, Officers or the Company as soon as practicable during the Policy Period give written notice to the Insurer of the circumstances and the reasons for anticipating a Claim, then any Claim subsequently made based upon such circumstances (of which the Insurer receives proper notice under Section VII.A.) shall be deemed for the purposes of this Policy to have been first made during the Policy Period; provided, however, as a condition precedent for any coverage to arise hereunder, such notice must be specific and contain full particulars as to the facts and circumstances potentially giving rise to the Claim, including a narrative setting forth dates, names of the potential plaintiffs and affected Directors or Officers, names of other parties involved, the nature and scope of the anticipated Claim, and all reasons why such a Claim is reasonably to be anticipated.

Form No. GIC-7418 (9/97)
page 6 of 8

## SECTION VIII.  GENERAL CONDITIONS

A.  CANCELLATION OR NON-RENEWAL

(1) By acceptance of this Policy, the Company and the Directors and Officers hereby confer the exclusive power and authority to cancel this Policy to the Insured Entity. The Insured Entity may cancel this Policy by surrender thereof to the Insurer, or by mailing to the Insurer written notice stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Delivery of such written notice shall be equivalent to mailing.

(2) This Policy may be canceled by the Insurer by mailing to the Insured Entity written notice stating when, not less than sixty (60) days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Delivery of such written notice by the Insurer shall be equivalent to mailing.

(3) If this Policy is canceled by the Insured Entity, the Insurer shall retain the customary short rate portion of the premium. If this Policy is canceled by or on behalf of the Insurer, the Insurer shall retain the pro-rata portion of the premium. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

(4) If the Insurer elects not to renew this Policy, the Insurer shall provide the Insured Entity with no less than sixty (60) days advance notice thereof, unless any of the events described in Section VIII.B. occur.

B.  SUBSEQUENT MAJOR EVENTS

If in the event of:

(1) the acquisition by another entity or persons of the Insured Entity, a majority of its voting securities, or substantially all of its assets;

(2) the merger or consolidation of the Insured Entity into or with another entity such that the Insured Entity is not the surviving entity; or

(3) the appointment of a receiver, liquidator, conservator, trustee or similar official with respect to the Insured Entity;

then the Policy will remain in effect until the end of the Policy Period as stated in Item 2 of the Declarations, but only with respect to Wrongful Acts occurring prior to such acquisition, merger, consolidation or appointment. Further, the premium will be considered fully earned upon the occurrence of any of the above events in consideration of the coverage extended.

C.  REPRESENTATIONS

It is agreed that the information and statements contained in the Application for this Policy, a copy of which is attached hereto, and any materials submitted therewith (which are on file with the Insurer and shall be deemed to be attached to and part of the Application as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

By acceptance of this Policy the Directors and Officers and the Company agree:

(1) That the statements in the Application and in any materials submitted therewith are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Insurer under this Policy, and that this Policy is issued in reliance upon the truth of such representations; and

Form No. GIC-7418 (9/97)
page 7 of 8

(2) That in the event that the Application, including materials submitted therewith, contains misrepresentations made with the actual intent to deceive, or contain misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the Insurer under this Policy, no coverage shall be afforded under this Policy (including under Insuring Agreement Section I.B.) for any Director or Officer who did not sign the Application but who knew on the inception date of this Policy the facts that were so misrepresented, and this Policy in its entirety shall be void and of no effect whatsoever if such misrepresentations were known to be untrue on the inception date of the Policy by one or more of the individuals who signed the Application.

D.  ACTION AGAINST THE INSURER

(1) No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all terms of this Policy, and until the Directors', Officers' or the Company's obligation to pay shall have been finally determined, either by an adjudication or by written agreement of the Directors, Officers, and/or the Company, and the Insurer.

(2) No persons or entities shall have any right under this Policy to join the Insurer as a party to any Claim, nor shall the Insurer be impleaded by the Directors, Officers, or the Company or their legal representatives in any Claim.

E.  SUBROGATION

In the event of any payment under this Policy, the Insurer shall be subrogated to any of the Directors', Officers' and the Company's rights to recovery thereof. The Directors or Officers and the Company shall execute all papers required and shall do everything that may be necessary to secure or transfer such rights, including the execution of such documents as may be necessary to enable the Insurer to effectively bring suit in the name of any Director, Officer or the Company. The Insurer shall not exercise these rights of subrogation against a Director or Officer with respect to Loss excluded by Section IV.B., however, unless such individual has been judicially determined to have committed deliberate fraudulent, dishonest or criminal acts.

F.  ASSIGNMENT

Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

G.  CONFORMITY TO STATUTE

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance (or equivalent authority) ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein shall be construed to restrict the terms of any State Amendatory Endorsement. In addition, to the extent permissible by law, nothing in any State Amendatory Endorsement shall be construed to restrict the terms of this Policy.

H.  ENTIRE AGREEMENT

By acceptance of this Policy, the Directors, Officers and the Company and the Insurer agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement between the parties.

I.  CHANGES

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer shall not effect a waiver or a change in any part of this Policy or stop the Insurer from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

Form No. CIC-7418 (9/97)
page 8 of 8

# GENESIS   GENESIS INSURANCE COMPANY

### ADDITION TO SECTION VIII
### GENERAL CONDITIONS

Policy Number: YXB001625A

It is understood and agreed that Section VIII. of the Policy is hereby amended by the addition of the following paragraph J to said Section:

## J.   EMPLOYMENT PRACTICES EXTENSION

It is hereby understood and agreed that coverage as is afforded by this Policy is extended to Employment Practices Claims against an INSURED (whether such claims are brought by a past, present or prospective employee or employees, whether directly or by class action, or by the Equal Employment Opportunity Commission [EEOC] or any other state or federal governmental authority regulating employment practices, or by any other person or entity) subject to a $5,000,000 sublimit of liability for all Employment Practices Claims made in the aggregate during the Policy Period, the terms, conditions and exclusions of this endorsement and to the other terms, conditions and exclusions of the Policy.

It is further understood and agreed that for the purposes of this endorsement only, the following definitions shall apply:

(1)   "Employment Practices Claim" shall mean any Claim relating to a past, present or prospective employee of the Company for or arising out of any actual or alleged wrongful dismissal, discharge or termination, either actual or constructive, of employment, employment-related misrepresentation, wrongful failure to employ or promote, wrongful deprivation of career opportunity, wrongful discipline; failure to grant tenure or negligent employee evaluation, or sexual or workplace harassment of any kind (including the alleged creation of a harassing workplace environment); or unlawful discrimination, whether direct, indirect, intentional or unintentional, or failure to provide adequate employee policies and procedures.

Employment Practices Claims shall include claims brought under state, local or federal law (whether common or statutory) and shall include but not be limited to allegations of violations of the following federal laws (as amended) including regulations promulgated thereunder:

(a)   Americans with Disabilities Act of 1992 (ADA),

(b)   Civil Rights Act of 1991,

(c)   Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990,

(d)   Title VII of the Civil Rights Law of 1964, as amended (1983), including the Pregnancy Discrimination Act of 1978,

(e)   Civil Rights Act of 1866, Section 1981, and

(f)   Fifth and Fourteenth Amendments of the U.S. Constitution.

(2)   "INSURED" shall include for the purposes of Employment Practices Claims only, any Director, Officer or employee of the Company whether such individual is in a supervisory, co-worker or subordinate position or otherwise. Coverage shall automatically apply to all new Directors, Officers or employees after the inception date of Policy.

It is further understood and agreed that additional coverage is hereby granted for Employment Practices Claims only by amending Exclusions IV. E. and IV. I. of the Policy as follows:

(E)    for bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof;

(I)    which are brought by any Director or Officer or the Company; or which are brought by any security holder of the Company, whether directly or derivatively, unless such Claim (s) is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Director or Officer or the Company, provided, however, this exclusion shall not apply to Employment Practices Claims;

Exclusions IV. E. and IV. I. of the Policy remain in effect for Claims other than Employment Practices Claims.

It is further understood and agreed that Item 4. of the Declarations Page is amended for Employment Practices Claims only as follows:

ITEM 4.   Retentions Applicable to Insuring Agreements

$    0   Each INSURED for each Employment Practices Claim, but in no event exceeding

$    0   Each Employment Practices Claim for all INSUREDS under Insuring Agreement Section I.A.; and

$ 150,000  Each Employment Practices Claim under Company Reimbursement Insuring Agreement Section I. B.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Date:  January 5, 1999                    By:  *Michael Zartman*

Company Officer or Authorized Agent

Form No. GIC-7425.EP  (08/93)

# GENESIS     GENESIS INSURANCE COMPANY

### ADDITION TO SECTION VIII
### GENERAL CONDITIONS

Policy Number: YXB001625A

It is understood and agreed that the Policy is amended as follows:

## CHANGES TO SECTION II:

Section II is hereby amended as follows:

A. "Claim" shall mean the following proceedings initiated against a Director or Officer for money damages or other relief, whether brought within or outside of the United States:

    (1)   any civil, arbitration or administrative proceeding commenced by: (a) service of a complaint or similar pleading, or (b) receipt of a notice of charges;

    (2)   any criminal proceeding commenced by the return of an indictment or an information;

    (3)   any administrative or regulatory investigation commenced by a formal order of investigation;

    (4)   any appeal from the above proceedings; or

    (5)   other written or verbal demand for money or services.

"Claim" shall also mean any of the above-listed proceedings initiated against a Director, Officer or the Company which is a Securities Claim.

B. "Company" shall mean the Insured Entity and its Subsidiaries under Insuring Agreements Sections I.A. and Under Insuring Agreement Section I.C., "Company" shall mean the Insured Entity only. "Company" shall also include the Insured Entity as a debtor-in-possession in the event of bankruptcy.

K. "Subsidiary" shall mean:

    (1)   any entity in which the Insured Entity owns or at any time owned fifty percent (50%) or more of the issued and outstanding voting securities, directly or indirectly, subject to clauses (2) and (3) below for acquisitions made by the Company during the Policy Period;

    (2)   any entity in which the Insured Entity acquires 50% or more of the issued and outstanding voting securities or substantially all of the assets, directly or indirectly, during the Policy Period, if such entity's total assets represent less than 25% of the Company's total assets prior to the acquisition; and

    (3)   for forty-five (45) days immediately following the acquisition date, any entity in which the Insured Entity acquires 50% or more of the issued and outstanding voting securities or substantially all of the assets, directly or indirectly, during the Policy Period, if such entity's total assets represent more than 25% of the Company's total assets prior to the acquisition; provided, however, such entity will not be considered a Subsidiary or included within the definition of Company beyond such automatic forty-five (45) day period unless the Insurer specifically agrees in writing to provide such coverage, subject to such additional information, coverage terms and premium as the Insurer may require.

The term "Subsidiary" shall also include any subsidiary of a Subsidiary.

**CHANGES TO SECTION VII:**

Section VII is hereby amended as follows:

A. The Directors, Officers and/or the Company shall give the Insurer written notice as soon as practicable of any Claim first made during the Policy (or Discovery) Period, and in no event later than sixty (60) days after the expiration of the Policy (or Discovery) Period, and, for Claims deemed to be first made during the Policy Period under Section VII.B., within sixty (60) days from when such Claims are made.

**CHANGES TO SECTION VIII:**

Section VIII is hereby amended as follows:

A.(2) This Policy shall not be canceled by the Insurer except for nonpayment of the premium.

A.(4) If the Insurer elects not to renew this Policy, the Insurer shall provide the Insured Entity with no less than sixty (60) days advance notice thereof, unless any of the events described in Section VIII.B. occur.

B. **SUBSEQUENT MAJOR EVENTS**

If in the event of:

(1) the acquisition by another entity or persons of the Insured Entity, a majority of its voting securities, or substantially all of its assets; or

(2) the merger or consolidation of the Insured Entity into or with another entity such that the Insured Entity is not the surviving entity;

then the Policy will remain in effect until the end of the Policy Period as stated in Item 2 of the Declarations, but only with respect to Wrongful Acts occurring prior to such acquisition, merger, consolidation or appointment. Further, the premium will be considered fully earned upon the occurrence of any of the above events in consideration of the coverage extended. The Company will have the right, upon the events described in (1) and (2) above to purchase a six (6) year "run-off" policy to replace this Policy, under the same terms and conditions, for no more than 1.1 times the annual premium, less any unearned premium remaining under this Policy if it is canceled and so replaced.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy other than as above stated.

Date:  January 6, 1998            By: _____
                                         Company Officer or Authorized Agent

Form No. GIC-7425  (08/93)

# GENESIS    GENESIS INSURANCE COMPANY

### REINSTATEMENT OF EXCESS LIMIT ENDORSEMENT

Policy Number: YXB001625A

It is understood and agreed that Section V. of the Policy is hereby amended by the addition of the following paragraph (H):

H.    In the event a Claim is first made after during the Policy Period and reported to the Insurer pursuant to Section VII. A. of the Policy, then, upon the Company's written request to the Insurer, and upon payment of an additional premium of one hundred percent (120%) of the then unearned Premium, the Limit of Liability as stated in Item 3 of the Declarations shall be amended to consist of both a First Limit and a Reinstated Excess Limit as follows:

(1)    The Limit of Liability shall include a "Reinstated Excess Limit" equal to the Limit of Liability as stated in Item 3 of the Declarations for all Loss in the aggregate arising out of Claims first made during the part of the Policy Period beginning at 12:01 a.m. on the Effective Date of the Reinstated Excess Limit and ending on the expiration of the Policy Period or the Discovery Period (if applicable). The Reinstated Excess Limit shall be separate from and in addition to the First Limit.

(2)    The Limit of Liability shall also include a "First Limit" equal to the Limit of Liability as stated in Item 3 of the Declarations for all Loss in the aggregate arising out of Claims first made and reported during the Policy Period.

(3)

(a)    The Reinstated Excess Limit shall not apply to Claims made after the Effective Date of the Reinstated Excess Limit which are considered a single Claim (under Section V.C. above) with any Claim first made prior to the Effective Date of the Reinstated Limit, regardless of when or whether the prior Claim is reported to the Insurer.

(b)    The Reinstated Excess Limit shall not apply to Claims based upon or arising out of any Wrongful Acts if any Directors or Officers knew or could have reasonably foreseen, prior to or on the Effective Date of the Reinstated Limit, that such Wrongful Acts might give rise to a Claim.

(c)    The Reinstated Excess Limit shall be excess of (and not available until after full exhaustion of) the First Limit and all limits of liability provided by other insurance policies which are specifically excess of this Policy by reference hereto (including reference to the Policy Number).

(4)    The "Effective Date of the Reinstated Excess Limit" is the date upon which the Insurer is in receipt of both the written request and additional premium as set forth herein.

(5)    Under no circumstances may the covered Loss for any single Claim (under Section V.C.) exceed $25,000,000, whether applied from the First Limit or the Reinstated Excess Limit, or a combination thereof.

(6) There may be one and only one Reinstated Excess Limit, and one and only one Effective Date of the Reinstated Excess Limit, under this Policy.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Date: <u>January 8, 1996</u>                    By: *Michael Zartman*

                                                    Company Officer or Authorized Agent

Form No. GIC-7425.RE (08/93)

# GENESIS    GENESIS INSURANCE COMPANY

### DIRECTORS AND OFFICERS LIABILITY INSURANCE
### COLORADO DISCLOSURE FORM CLAIMS MADE POLICY

Policy Number: YXB001625A

## IMPORTANT NOTICE TO POLICYHOLDERS

THIS DISCLOSURE FORM IS NOT YOUR POLICY. IT MERELY DESCRIBES SOME OF THE MAJOR FEATURES OF OUR CLAIMS MADE POLICY FORM. READ YOUR POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES, AND WHAT IS AND IS NOT COVERED. ONLY THE PROVISIONS OF YOUR POLICY DETERMINE THE SCOPE OF YOUR INSURANCE PROTECTION.

Your Policy is a claims made policy. It applies only to Claims made against you after the inception date and before the end of the Policy Period involving injury or damage that occurs after the Policy's Past Acts Date. Upon termination of your Policy, a Discovery Period may be available.

## OCCURRENCE VS. CLAIMS-MADE

There is no difference in the kinds of injury and damage covered by either an "occurrence" policy or a "claims made" policy. Claims for damages may be assigned to different policy periods, however, depending on which policy you have purchased.

In an "occurrence" policy, coverage is provided for liability because of bodily injury and property damage that occurs during the policy period, no matter when the claim is made.

In your "claims made" policy, coverage is provided for a Wrongful Act if the Claim is first made during the Policy Period. The Claim must be a demand for damages by an injured party but it does not have to be in writing. Under most circumstances, a Claim is considered made when it is received and recorded by you or by us; but sometimes, a Claim may be deemed made at an earlier time. This can happen when another Claim for the same injury or damage has already been made, or when the Claim is received and recorded during the Discovery Period.

## PRINCIPAL BENEFITS

This Policy provides coverage for Loss resulting from Claims first made during the Policy Period against Officers and Directors for a Wrongful Act up to the maximum dollar limit specified in the Policy.

The principal benefits and coverage are explained in detail in your claims made policy. Please read it carefully.

## EXCEPTION, REDUCTION AND LIMITATIONS

Your claims made policy contains certain exceptions, reductions and limitations. Please read it carefully.

## RENEWALS, TAILS AND DISCOVERY PERIODS

Your claims made policy has some unique features relating to renewal, Discovery Period, and coverage of occurrences with long periods of exposure. These special claims made provisions are described below:

### Special "Claims Made" Provisions

Two concepts relating to continuity of coverage under the "claims made" policy are especially important to understand. These involve the "Past Acts Date" and the "Discovery Period."

### Retroactive Date

When you have a "Past Acts Date", there is no coverage for a Wrongful Act that occurred before that Past Acts Date, even if the Claim is first made during the Policy Period.

If there is no Past Acts Date, the Policy will respond only to Claims first made during the Policy Period for covered damage, no matter when the damage occurred. But if previous "occurrence" type insurance also applies to the injury or damage, your "claims made" policy will be excess; that is, it will apply only after that previous insurance is used up.

If there is a Past Acts Date, it cannot be moved ahead in time, except under certain circumstances. e.g., you changed insurers; there is substantial change in your operations that increases your exposure to loss; you failed to provide us with information you knew about the nature of your business or premise, and then only with your written consent. It is important to understand how the "claims made" policy's Discovery Period guarantees continuity of coverage if you are offered a renewal or replacement policy with a later Past Acts Date than the one in your current Policy.

### DISCOVERY PERIOD or "Tails"

**WARNING**

If a Claim is made after the termination of your claims made policy, you may not have coverage for that Claim unless you purchase a Discovery Period or "tail" endorsement, which must be offered to you for at least one year, at a premium not to exceed 200% of your terminated policy premium.

Carefully review the policy provisions regarding the available Discovery Period, especially the length of coverage and price, and the time during which you must purchase or accept any offered Discovery Period.

Date: January 8, 1999                     By: _Michael Zartman_
                                              _____
                                              Company Officer or Authorized Agent

FORM NO. GIC-7473 (08/93)  CO

 GENESIS INSURANCE COMPANY

**DIRECTORS AND OFFICERS LIABILITY INSURANCE**
**COLORADO FRAUD STATEMENT**

### IMPORTANT NOTICE TO APPLICANTS

Policy Number: YXB001625A

THE STATE OF COLORADO REQUIRES THAT THIS STATEMENT BE ATTACHED TO EVERY DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY APPLICATION. PLEASE READ THE STATEMENT CAREFULLY.

IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OR DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OR INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of any policy issued by the insurer.

Date: <u>January 8, 1999</u>

By: _Michael Zartman_

Company Officer or Authorized Agent

FORM NO. GIC-7474.CO (06/96)

# GENESIS    GENESIS INSURANCE COMPANY

## DIRECTORS AND OFFICERS LIABILITY INSURANCE
## COLORADO AMENDATORY ENDORSEMENT

Policy Number: YXB001525A

Section III. is hereby amended as follows:

### SECTION III. DISCOVERY PERIOD

E.  [additional provision]
In the event of renewal on terms and conditions different from those in effect during the Policy Period, the Company shall have the right, upon payment of an additional premium to be determined by the Insurer, to an extension of the original terms and conditions with respect to any Claim first made during the period of one year after the effective date of renewal, but only with respect to any Wrongful Act committed prior to the effective date of the renewal. This right of extension shall terminate unless written notice of such election is received by the Insurer within thirty (30) days after the effective date of renewal.

B.  [replacement]
The right to purchase the Discovery Period shall terminate unless a written request for the Discovery Period is given to the Insurer within sixty (60) days after the effective date of cancellation, or, in the event of a refusal to renew, within sixty (60) days after the Policy Period ends, together with payment of the appropriate premium for the Discovery Period. In the event that such written request and premium paid is not so given to the Insurer, there shall be no right to purchase the Discovery Period at any later date.

All other provisions of the Policy remain unchanged.

Date: January 8, 1998                    By: _Michael Zartman_

                                         Company Officer or Authorized Agent

FORM NO. GIC-7480 (09/97)  CO

# GENESIS    GENESIS INSURANCE COMPANY

### DIRECTORS AND OFFICERS LIABILITY INSURANCE
### COLORADO AMENDATORY ENDORSEMENT

Policy Number: YXB001625A

Section VIII. is hereby amended as follows:

X.    [additional provision]
LOSS INFORMATION

The Insurer must furnish to the Insured Entity, upon its request and within thirty (30) days thereafter, sufficient information about closed or paid Claims, Claims for which the Insurer has established reserves, and claims for which the Insurer has received notices of occurrences which could give rise to Claims, to allow the Insured Entity to determine how much of its aggregate coverage remains available under the Policy.

All other provisions of the Policy remain unchanged.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above-mentioned policy other than as above stated.

Date: January 8, 1999          By: _Michael Zortman_
                                   Company Officer or Authorized Agent

FORM No. GIC-7481 (2/97) CO

# GENESIS   GENESIS INSURANCE COMPANY

## OUTSIDE DIRECTORSHIP COVERAGE
### (WITH EQUITY INTEREST)

**Policy Number:** YXB001625A

It is hereby understood and agreed that the insurance provided by this Policy is extended to include coverage for the Directors and Officers of the Company as Directors or Officers of _____ (hereinafter called "Other Entity"), as part of their regularly assigned duties with the Company subject to the Policy terms and conditions, provided that coverage shall not apply to any Loss in connection with any Claim made against such Directors or Officers, unless the Directors or Officers are entitled to indemnification by the Company pursuant to applicable laws and regulations. It is further understood and agreed that:

1.  Coverage provided by this Endorsement is available only to the extent that the serving Directors or Officers are not indemnified by the Other Entity; and

2.  This extension of coverage is to be excess of any other insurance, including but not limited to, Directors and Officers Liability Insurance and/or Directors and Officers Reimbursement Insurance provided for, to, or by the Other Entity.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Date:  January 8, 1989                    By:  *Michael Zortman*

                                          Company Officer or Authorized Agent

Form No. GIC-7-456 (08/63)

In Witness Whereof, we have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by our authorized representative.

Secretary                                    President

GIC-12-8J

# EXHIBIT C

02/14/2002    15:16    WILEY REIN & FIELDING → WSGR                    NO.467    P02



**Wiley Rein & Fielding** LLP

### RECEIVED

FEB 1 4 2002

WILSON, SONSINI,
GOODRICH & ROSATI

Jason P. Cronic
202.719.7175
jcronic@wrf.com

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX      202.719.7049

Virginia Office
7925 JONES BRANCH DRIVE
SUITE 6200
McLEAN, VA 22102
PHONE  703.905.2800
FAX      703.905.2820

www.wrf.com

February 14, 2002

**VIA FACSIMLE &
REGULAR MAIL**

Leo Cunningham, Esq.
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304-1050

Re:    Insured:        Coram Healthcare Corporation
        Genesis Policy No.:  YXB001625A (the "Policy")
        Matter:        *In re Coram Resource Network, Inc. and*
        *Coram Indep. Practice Assoc.,* Bankruptcy Case
        No. 99-2889(MFW) (Bankr. D. Del.); *Official*
        *Committee of Unsecured Creditors, et al. v. Coram*
        *Healthcare Corporation, et al.,* Adv. Proc. No. TBD
        (Bankr. D. Del.) (collectively, the "CRNI suit")

Dear Leo:

We write in response to your inquiry regarding Genesis's views on the appropriate
allocation between covered and non-covered loss in connection with the CRNI suit.

Preliminarily, we note our understanding that Coram Healthcare is in the process of
authorizing indemnification for the individual defendants named in the CRNI suit.
Please let us know when that process is completed. We also understand that the
individual defendants propose to retain your firm, Wilson, Sonsini, Goodrich and
Rosati ("WSGR"), as counsel in connection with that matter. Subject to Coram's
approval regarding indemnification and an agreement on an appropriate allocation
and the other issues identified in this letter, Genesis consents to that representation.

As indicated in our December 18, 2001, letter to David Schwab, the CRNI suit
implicates certain Policy provisions that limit or bar coverage under the Policy. As
also noted in that letter, the Policy provides for an allocation between covered and
non-covered loss:

> If both Loss covered by this Policy and other loss are
> incurred, either because a Claim includes both
> covered and non-covered matters, or because a Claim
> is made against both covered and non-covered parties,
> then the Directors, Officers, the Company and the

**Wiley Rein & Fielding LLP**

Leo Cunningham, Esq.
February 14, 2002
Page 2

> Insurer agree to use their best efforts to determine a
> fair and proper allocation of all such amounts. In
> making such determination, the parties shall take into
> account the relative legal and financial exposures, and
> the relative benefits obtained in connection with the
> defense and/or settlement, of and between the covered
> and non-covered parties and matters involved in the
> Claim. In the event the parties cannot agree to an
> appropriate allocation percentage for the Claim, then
> the Insurer shall be obligated to make an interim
> payment of the amount of Loss, including Defense
> Costs, which the parties agree is not in dispute until a
> final allocation is agreed upon or determined pursuant
> to the terms of this Policy.

Policy, Section V.G. Consistent with this provision, Genesis believes an allocation
is required with respect to this claim for several reasons.

First, the plaintiff purports to be proceeding pursuant to an assignment of the rights
of Coram Resource Network, Inc. ("CRNI") and Coram Independent Practice
Association ("CIPA"). Thus, a number of the causes of action in the CRNI suit,
including, *inter alia*, the claims relating to the willful violation of the automatic
stay, conversion, and breach of fiduciary duty, appear to be included solely pursuant
to rights granted by that assignment. These allegations, which are at the heart of the
underlying dispute, i.e., that defendants allegedly improperly operated CRNI and
CIPA in such a fashion as to divert substantial funds to Coram Healthcare and
Coram, Inc., constitute Claims "[b]rought by, at the behest of, or with the assistance
or active participation of, the Insured Entity or a Subsidiary (or any affiliated
person), or any Director or Officer of the Insured Entity or a Subsidiary" and are
barred from coverage pursuant to Exclusion IV.I. *See Niemuller v. National Union
Fire Insurance Co.*, 1993 WL 546678 (S.D.N.Y. Dec. 30, 1993).

Second, Coram Healthcare Corporation and Coram Inc. are named as defendants in
the CRNI suit. However, because the suit does not constitute a "Securities Claim"
as defined by Section II.I of the Policy, there is no coverage for Coram Healthcare
or its Subsidiaries, beyond any indemnification of its Directors and Officers for
Loss arising out of a Claim against such Directors and Officers that is otherwise
covered by the Policy. Policy, Section I.B.

02/14/2002    15:16    WILEY REIN & FIELDING → WSGR    NO.467   D04

Wiley Rein & Fielding LLP

Leo Cunningham, Esq.
February 14, 2002
Page 3

Third, as set forth more fully in the December 18 letter, certain Policy terms and
conditions potentially limiting or barring coverage remain implicated, including the
definitions of "Loss" and "Wrongful Act," the exclusion relating to personal profit
to which the Directors or Officers were not legally entitled, and the exclusion
related to Claims arising out of the committing in fact of deliberate fraudulent,
dishonest or criminal acts. Policy, Sections II.F, II.L, IV.A, and IV.B. Genesis
continues to reserve its rights with respect to these Policy terms and conditions.

Accordingly, based on the foregoing, Genesis proposes to advance 40% of the
Defense Costs incurred by the individual defendants in connection with the CRNI
suit, subject to pertinent Policy limits and other Policy terms and conditions. This
advancement would commence following the satisfaction of the applicable allocated
retention and the execution of an appropriate advancement agreement and
undertaking. We welcome your thoughts on this matter, but stress that we believe
this proposal fairly takes "into account the relative legal and financial exposures and
the relative benefits obtained in connection with the defense and/or settlement, of
and between the covered and non-covered parties and matters involved in the"
CRNI suit, as set forth in Section V.G. of the Policy.

Finally, we have enclosed a copy of our client's billing guidelines for your reference
in connection with this matter. Also, please be advised that this letter, as well as all
past, present and future communications, is sent pursuant to a complete reservation
of all of Genesis's rights under the Policy and at law.

Sincerely yours,

Jason P. Cronic

cc:    Daniel J. Standish, Esq.

# EXHIBIT D

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release ("Settlement Agreement") is made and entered into as of this 2nd day of May, 2003 by and among HOBART G. TRUESDELL, in his capacity as Chief Restructuring Officer of Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. ("TRUESDELL"), CORAM RESOURCE NETWORK, INC., a Delaware corporation ("CRN"), CORAM INDEPENDENT PRACTICE ASSOCIATION, INC., a New York corporation ("CIPA" and together with CRN, collectively referred as "R-NET"), the OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CORAM RESOURCE NETWORK, INC. AND CORAM INDEPENDENT PRACTICE ASSOCIATION, INC. (the "R-NET COMMITTEE"), ARLIN M. ADAMS, in his capacity as Chapter 11 Trustee For the Bankruptcy Estates of Coram Healthcare Corporation and Coram, Inc. ("TRUSTEE"), CORAM HEALTHCARE CORP., a Delaware corporation ("CHC"), and CORAM, INC., a Delaware corporation ("CI" and together with CHC, collectively referred to as "CORAM") and is made with reference to the following:

RECITALS

    A.    WHEREAS, CRN and CIPA are direct or indirect wholly-owned subsidiaries of CORAM;

    B.    WHEREAS, on August 19, 1999, a small group of creditors commenced an involuntary bankruptcy case against CRN pursuant to Section 303 of Title 11 of the United States Code §§ 101, et. seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

    C.    WHEREAS, on November 12, 1999, CRN consented to the involuntary bankruptcy filing, and, together with CIPA, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code;

    D.    WHEREAS, R-NET's bankruptcy cases (the "R-NET Bankruptcy Cases") were consolidated for administrative purposes and are now pending in the Bankruptcy Court under the docket of *In re Coram Resource Network Inc. and Coram Independent Practice Association, Inc.*, Case No. 99-2889 (MFW);

    E.    WHEREAS, on November 23, 1999, the R-NET COMMITTEE was appointed;

    F.    WHEREAS, on December 6, 1999, Hobart G. Truesdell was appointed by the Bankruptcy Court as R-NET's Chief Liquidating Officer;

    G.    WHEREAS, in March of 2000, CHC, together with certain affiliates, filed proofs of claim in the R-NET Bankruptcy Cases totaling $49,426,856.89 (the "CORAM Claim"), representing the net amount due to CORAM from R-NET from 1995 through 1999 for: (a) services provided to CRN by CHC and its affiliates, (b) inter-company receivables owed to CHC for expenses paid by CHC on behalf of CRN; and (c) repayments on a letter of credit made on

behalf of R-NET (the CORAM Claim is net of a credit of $207,100,175 for cash received by CHC on behalf of R-NET);

H.      WHEREAS, the R-NET COMMITTEE objected to CHC's proofs of claim;

I.      WHEREAS, on or about August 8, 2000, CORAM commenced two bankruptcy cases (the "CORAM Bankruptcy Cases") by filing petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

J.      WHEREAS, the CORAM Bankruptcy Cases were consolidated for administrative purposes and are now pending in the Bankruptcy Court under the docket of *In re Coram Healthcare Corp. and Coram, Inc.*, Case No. 00-3299 (MFW);

K.      WHEREAS, in September of 2000, R-NET filed four proofs of claim against CORAM seeking $41,524,000.00 on the basis of an alleged agreement by CORAM to reimburse R-NET for services provided by R-NET in connection with an agreement with Aetna U.S. Healthcare (the "R-NET Reimbursement Claim");

L.      WHEREAS, also in September of 2000, R-NET filed three additional proofs of claim for any and all other claims or causes of action arising in law, equity or otherwise which may be raised by R-NET (together with R-NET Reimbursement Claim, the "R-NET Claims");

M.      WHEREAS, on September 5, 2001, by Stipulation and Order Assigning to Committee the Right to Pursue Certain Claims on Behalf of the Estate, the Bankruptcy Court approved R-NET's assignment of the R-NET Claims to the R-NET COMMITTEE;

N.      WHEREAS, the entire basis for the R-NET Claims is the allegations made in that adversary proceeding filed in the R-Net Bankruptcy Cases on November 13, 2001 (the "Adversary Proceeding") styled *Official Committee of Unsecured Creditors of Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. v. Coram Healthcare Corp., et al.*, Adv. Proc. No. 01-08795, and pending in the United States District Court for the District of Delaware (the "District Court") under Case No. 03-CV-34.

O.      WHEREAS, on or about May 31, 2000, R-NET filed the Liquidating Chapter 11 Plan of Coram Resource Network, Inc. and Coram Independent Practice Association, Inc. together with an accompanying disclosure statement;

P.      WHEREAS, on October 21, 2002 the R-NET COMMITTEE filed the Liquidating Chapter 11 Plan as Modified Proposed by the Official Committee of Unsecured Creditors of Coram Resource Network, Inc., and Coram Independent Practice Association and accompanying disclosure statement;

Q.      WHEREAS, the TRUSTEE has objected to the R-NET COMMITTEE's disclosure statement;

2

08/12/2003 08:18 FAX 2156653165          ORME                                    ☒004

R.   WHEREAS, on May 2, 2003, the TRUSTEE filed the Chapter 11 Trustee's Joint Plan of Reorganization (the "TRUSTEE's Plan") and accompanying disclosure statement which provides for, *inter alia*, approval of the Settlement Agreement;

S.   WHEREAS, the parties to this Settlement Agreement (individually and collectively referred to as the "Parties") desire to fully and completely resolve any and all disputes that have been raised or could be raised between them concerning the CORAM Claims and the R-NET Claims, including, without limitation, all claims raised in the Adversary Proceeding.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements set forth herein, and subject to the terms and conditions set forth below, and intending to be legally bound hereby, TRUESDELL,  R-NET, the R-NET COMMITTEE, CORAM and the TRUSTEE agree as follows:

1.   Claims.

a.   R-NET's general unsecured claim against CORAM shall be fixed and allowed in the total amount of seven million nine hundred fifty thousand dollars ($7,950,000.00) (the "R-NET Settlement Amount").

b.   CORAM's general unsecured claims against R-NET shall be fixed and allowed in the total amount of one thousand dollars ($1,000.00) per proof of claim filed (the "CORAM Settlement Amount") and distributed in accordance with the terms set forth in any plan of reorganization confirmed in the R-NET Bankruptcy Cases.

2.   Agreements of the Parties.  The TRUESDELL, R-NET, the R-NET COMMITTEE, CORAM and the TRUSTEE acknowledge and agree to the following terms and conditions:

a.   The TRUSTEE's Plan provides for a *pro rata* distribution to holders of allowed general unsecured claims equal to one hundred cents on the dollar (without post-petition interest), and provides for a possible distribution on account of interest accruing (at the applicable federal judgment rate) from CORAM's bankruptcy petition date through the effective date of the TRUSTEE's Plan.

b.   The TRUSTEE, TRUESDELL, R-NET and the R-NET COMMITTEE agree to use their best efforts to obtain approval of this Agreement in the CORAM BANKRUPTCY CASES through confirmation of the Trustee's Plan in accordance with the Bankruptcy Code as soon as practicable.

c.   The TRUSTEE, TRUESDELL, R-NET and the R-NET COMMITTEE agree to use their best efforts to obtain approval of this Agreement in the R-NET Bankruptcy Cases as soon as practicable.

3

d.    The TRUSTEE shall undertake his best efforts to resolve the priority tax claim(s) asserted by the Internal Revenue Service ("IRS") against R-NET as a result of the Statutory Notice of Deficiency in the aggregate amount of $12,670,543.00, plus interest, for the tax years ended September 30, 1987, September 30, 1988, September 30, 1989, September 30, 1990 and September 30, 1991, issued on or about May 14, 1999, to T$^2$ Medical, Inc., a C1 subsidiary (the "Tax Claim").

3.    Conditions Precedent.  The parties hereby acknowledge and agree to the following conditions precedent to the dismissal of the Adversary Proceeding and the granting of mutual releases:

a.    This Agreement is approved in the CORAM Bankruptcy Cases through confirmation of the Trustee's Plan (as may be modified, amended or supplemented from time to time, or any other substantially similar plan proposed by or supported by the Trustee;

b.    This Agreement is approved in the R-NET Bankruptcy Cases; and

c.    The IRS withdraws the Tax Claim, the Tax Claim is expunged and/or the Tax Claim is resolved without any payment being required from TRUESDELL or R-NET.

4.    Dismissal and Release.  Upon the satisfaction of all of the conditions precedent set forth in paragraph 3 above:

a.    The R-NET COMMITTEE shall cause the Adversary Proceeding to be dismissed with prejudice;

b.    TRUESDELL, R-NET and the R-NET COMMITTEE shall release and forever discharge (i) the TRUSTEE and each of his agents, heirs, successors in interest, assigns and attorneys, and (ii) CORAM and each of their respective past and present officers, directors, shareholders, employees, agents, predecessors, successors in interest, assigns, attorneys, parent companies, companies in common ownership, subsidiaries, lenders (and principals of lenders), and affiliates and each of them (including but not limited to Donald J. Amaral, Steven A. Feinberg, Joseph D. Smith, James Glynn, Peter (Perry) Bernocchi, L. Peter Smith, Richard M. Smith, Scott Larson, Vito Ponzio, Kara Strickler Anderson, Wendy L. Simpson, Robyn Hansen, Scott Danitz), Cerberus Partners, L.P., Goldman Sachs Credit Partners, L.P., Foothill Capital Corporation and Foothill Income Trust, L.P., from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, accountings, costs and expenses (including, but not limited to, attorneys= fees and costs), damages, liens, judgments, actions and causes of action of every kind and nature whatsoever, at law or in equity, known or unknown, suspected or unsuspected, , including but not limited to the Adversary Proceeding, which TRUESDELL, R-NET and/or the R-NET COMMITTEE ever had, now has, and may in the future have, relating to or arising out of the R-NET Claims and occurring from the beginning of time to the date of this Settlement Agreement.

c.    The TRUSTEE and CORAM shall release and forever discharge (i) TRUESDELL and each of his agents, heirs, successors in interest, assigns and attorneys, (ii) the

4

08/12/2003 09:17 FAX 2156653165          ORMH                                    ☒006

R-NET COMMITTEE and each of its agents, successors in interest, assigns and attorneys, and (iii) R-NET and each of their respective past and present officers, directors, shareholders, employees, agents, predecessors, successors in interest, assigns, attorneys, parent companies, companies in common ownership, subsidiaries, and affiliates and each of them, from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, accountings, costs and expenses (including, but not limited to, attorneys' fees and costs), damages, liens, judgments, actions and causes of action of every kind and nature whatsoever, at law or in equity, known or unknown, suspected or unsuspected, which CORAM and/or the TRUSTEE ever had or now has, and may in the future have, relating to or arising out of the Coram Claims and occurring from the beginning of time to the date of this Settlement Agreement.

    5.    <u>Representations and Warranties.</u>

        a.    Each of the Parties hereto represents and warrants that they have carefully read this Settlement Agreement, the contents hereof are known to them, and that this Settlement Agreement is executed voluntarily and without duress or undue influence.

        b.    Each of the Parties hereto represents and warrants that in executing this Settlement Agreement they rely solely upon their own judgment, belief, and knowledge, and on the advice and recommendations of their own independently selected counsel, concerning the nature, extent, and duration of their rights and claims, and that they have not been influenced to any extent whatsoever in executing this Settlement Agreement by any representations or statements covering any matters made by any of the Parties or by any person representing them or any of them.

        c.    Each of the Parties hereto represents and warrants that the persons and entities executing this Settlement Agreement have the legal authority to do so.

    6.    <u>Acknowledgements by the Parties.</u>

        a.    Upon receipt of the settlement amounts referenced in Paragraph 1 above in the manner and method contemplated herein, THE TRUSTEE, TRUESDELL, R-NET and the R-NET COMMITTEE each acknowledge and agree that they have knowingly relinquished, waived and released any and all remedies that might otherwise be available to them for the matters or transactions that are the subject of this Settlement Agreement.

        b.    It is further acknowledged and agreed that this Settlement Agreement is a compromise of disputed claims, and that the exchange of consideration contemplated herein is not to be construed as an admission of liability on the part of the Parties hereby released.

    7.    <u>Applicable Law.</u>  This Settlement Agreement shall in all respects be interpreted, enforced and governed by the laws of the State of Delaware, disregarding Delaware's conflicts of law principles.

    8.    <u>Construction of Agreement.</u>

PHDATA 1109528_3

a.      This Settlement Agreement shall be construed as a whole according to its fair meaning and as if all the Parties hereto had jointly prepared this Settlement Agreement.

b.      Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural.

c.      Each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter.

d.      The words "herein," "hereunder" and "hereto" refer to this Settlement Agreement in its entirety rather than to a particular portion of this Settlement Agreement.

e.      Captions and headings in this Settlement Agreement are inserted for convenience of reference only and are not intended to be a part of, or to affect the interpretation of, this Settlement Agreement.

9.      Binding on Parties. This Settlement Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, representatives, successors, and assigns and each and every entity which now or ever was a division, parent, successor, predecessor, or subsidiary for any of the parties and/or their respective legal successors and assigns. In the event that the conditions precedent set forth in paragraph 4 above are not satisfied, each party shall be entitled to pursue any available claims, remedies or causes of action, in law or in equity, against the other party as if this Settlement Agreement did not exist.

10.      No Assignment. Except as otherwise specifically acknowledged in Recital M above, the Parties, and each of them, mutually acknowledge that they have not assigned to any person or entity all or any portion of any claim(s) released herein.

11.      Severability. In the event that any covenant, condition or other provision contained in this Settlement Agreement is held to be invalid, void or illegal by any court of competent jurisdiction, the covenant, condition, or other provision shall be deemed severable from the remainder of this Settlement Agreement and shall in no way affect, impair or invalidate any other covenant, condition or other provision. If any covenant, condition, or other provision shall be deemed invalid due to its scope or breadth, the covenant, condition or other provision shall be deemed valid to the extent of the scope or breadth permitted by law.

12.      Waiver. A breach of any provision of this Settlement Agreement can be waived only by a writing signed by the non-breaching party. Waiver of any one breach of any provision hereof shall not be deemed to be a waiver of any other breach of such provision or any other provision hereof.

13      Amendments. This Settlement Agreement may be amended only by a written agreement executed by the Parties.

6

14.    Entire Agreement. This Settlement Agreement constitutes the entire agreement between or among the Parties pertaining to the subject matter hereof, and there are no terms other than those contained herein. Any prior writing or agreement previously between the Parties and/or any of their affiliates or subsidiaries is superceded by this Agreement and shall be of no force and effect.

15.    Further Action. The parties hereto agree to execute promptly upon request any and all other documents and instruments necessary to effectuate the terms of this Settlement Agreement.

16.    Counterparts. This Settlement Agreement may be executed in counterparts and by facsimile and when each of the Parties has signed and delivered at least one such counterpart, each counterpart shall be deemed an original, and all counterparts taken together shall constitute one and the same agreement, which shall be binding and effective as to all Parties.

17.    Notices. All notices, claims, demands, and other communications hereunder shall be in writing and shall be delivered by facsimile transmission and overnight mail, addressed to the respective parties at the following addresses (or at such other address for a party as specified by notice under this Paragraph):

If to CORAM:

    Arlin M. Adams, Chapter 11 Trustee
    Schnader Harrison Segal & Lewis LLP
    1600 Market Street, Suite 3600
    Philadelphia, PA 19103

with a copy to:

    Barry E. Bressler, Esquire
    Schnader Harrison Segal & Lewis LLP
    1600 Market Street, Suite 3600
    Philadelphia, PA 19103

If to R-NET:

    Hobart G. Truesdell,
    Chief Restructuring Officer of R-Net
    C/o Walker Truesdell & Associates
    380 Lexington Ave. – Suite 1514
    New York, NY 10768

with a copy to:

    Edwin J. Harron, Esquire
    Young Conaway Stargatt & Taylor, LLP

7

PHDATA 1109524_3

The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

If to R-NET COMMITTEE:

Scott Shafer
Official Committee of Unsecured Creditors of R-Net
c/o Bayada Nurses, Inc.
101 Executive Drive
Moorestown, NJ 08057

with a copy to:

Lawrence J. Tabas, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103-1895

18.    Bankruptcy Court Approval.  This Settlement Agreement is subject to approval by
the Bankruptcy Court in both the CORAM Bankruptcy Cases and the R-NET Bankruptcy Cases.
The parties irrevocably consent to the jurisdiction of the Bankruptcy Court with respect to any
action to approve and enforce the terms and provisions of this Settlement Agreement and
expressly waives any right to commence any such action in any other forum or to contest the
jurisdiction of the Bankruptcy Court.

IN WITNESS WHEREOF, the Parties hereto have executed this Settlement Agreement,
effective as of the date first written above.

8

PHLDATA 1109528_3

08/12/2003 09:18 FAX 2156653165          ORMH                                    ☑010

07/24/2003 07:09 FAX 415 391 4833        American Audio Visual                  ☑001

HOBART G. TRUESDELL                      CORAM INDEPENDENT PRACTICE
                                         ASSOCIATION, INC.

_Hobart G. Truesdell_                    By: _Hobart G. Truesdell_
Hobart G. Truesdell,                         Hobart G. Truesdell,
Chief Restructuring Officer                  Chief Restructuring Officer
Coram Resource Network, Inc. and             Coram Resource Network, Inc. and Coram
Coram Independent Practice Association, Inc.  Independent Practice Association, Inc.

THE OFFICIAL COMMITTEE OF                CORAM RESOURCE NETWORK, INC.
UNSECURED CREDITORS OF CORAM
RESOURCE NETWORK, INC. AND
CORAM INDEPENDENT PRACTICE
ASSOCIATION, INC.

By: _Scott M Scheffer_                   By: _Hobart G. Truesdell_
Name: Scott Scheffer                         Hobart G. Truesdell,
Title: Co-Chairman                           Chief Restructuring Officer
                                             Coram Resource Network, Inc. and Coram
                                             Independent Practice Association, Inc.

ARLIN M. ADAMS                           CORAM HEALTHCARE CORP.

_Arlin M. Adams_                         By: _Arlin M. Adams_
Arlin M. Adams, as Chapter 11 Trustee of     Arlin M. Adams, Chapter 11 Trustee of
Coram Healthcare Corp. and Coram, Inc.       Coram Healthcare Corp. and Coram, Inc.

CORAM, INC.

By: _Arlin M. Adams_
Arlin M. Adams, Chapter 11 Trustee of
Coram Healthcare Corp. and Coram, Inc.

C:\DATA\1\email,\1\

# EXHIBIT E



Wiley Rein & Fielding LLP

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX       202.719.7049

Virginia Office
7925 JONES BRANCH DRIVE
SUITE 6200
McLEAN, VA 22102
PHONE  703.905.2800
FAX       703.905.2820

www.wrf.com

April 24, 2003

Jason P. Cronic
202.719.7175
jcronic@wrf.com

**VIA FACSIMILE**

Confidential Settlement
Communication

Wilbur L. Kipnes, Esq.
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Ste. 3600
Philadelphia, PA 19103-7213

Re:   Insured:              Coram Healthcare Corporation
       Genesis Policy No.:   YXB001625A (the "Policy")
       Matter:               *In re Coram Resource Network, Inc. and*
                             *Coram Indep. Practice Assoc.* (the "<u>CRNI</u> suit")

Dear Wil:

We write to follow-up on our conversation yesterday. As we discussed, Genesis Insurance Company ("Genesis") would prefer to discuss any resolution of the pending matters on a global, rather than piecemeal, basis. Accordingly, we suggest that that you provide us with your views regarding a global resolution as soon as possible, particularly given your client's expressed desire to resolve the <u>CRNI</u> suit in the immediate future.

In that regard, please note that Section VI.A. of the Policy provides that "The Directors, Officers and the Company shall not admit liability for or settle any Claim, or incur Defense Costs in connection with any Claim, without the Insurer's prior written consent . . . ." The suggestion that the Trustee may seek to settle the <u>CRNI</u> suit prior to resolving its current discussions with Genesis and without Genesis's consent would contravene the terms of the Policy. There is no coverage under the Policy for a settlement to which Genesis has not consented. *See* Policy, Section IV.A.

We look forward to your response. In the interim, this letter, as well as all past, present and future communications, is sent pursuant to a complete reservation of all of Genesis's rights under the Policy and at law.

Sincerely yours,

Jason P. Cronic

# EXHIBIT F

# Schnader
## ATTORNEYS AT LAW

1600 MARKET STREET   SUITE 3800
PHILADELPHIA, PA 19103-7286
215.751.2000   FAX 215.751.2205   schnader.com

May 2, 2003

Wilbur L. Kipnes
Direct Dial 215-751-2336
E-mail: wkipnes@schnader.com

*By Fax – 202-719-7049*

Jason P. Cronic, Esq.
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, D.C. 20006

Re:   Insured:            Coram Healthcare Corporation
      Genesis Policy No.:  YXB001625A (the "Policy")
      Matter:             *In re Coram Resource Network, Inc. and*
                          *Coram Indep. Practice Assoc.*, Bankruptcy Case
                          No. 99-2889(MFW) (Bankr. D. Del.)

Dear Jason:

Thank you for your letter of May 1. With respect to R-Net, Genesis has not agreed to cover its insureds, but has agreed to pay 40% of defense costs without prejudice to its right to later assert a different allocation or to disclaim coverage entirely. Under these circumstances, we do not believe that Genesis has any right to require the insureds to obtain Genesis' consent before settling.

I would like to meet on May 7 to discuss the R-Net settlement as well as Coram's claims against Crowley and the outside directors. Please let me know what time in the morning it would be convenient to begin.

Very truly yours,

*Bill*

Wilbur L. Kipnes
For SCHNADER HARRISON SEGAL & LEWIS LLP

cc:   Boris Feldman, Esq. (by fax)

Schnader Harrison Segal & Lewis LLP

NEW YORK, NY   PHILADELPHIA, PA   PITTSBURGH, PA   SAN FRANCISCO, CA   WASHINGTON, DC
CANONSBURG, PA   CHERRY HILL, NJ   HARRISBURG, PA

# EXHIBIT G

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CORAM HEALTHCARE CORP. and | : | Case No. 00-3299 (MFW) |
| CORAM, INC., | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |
| | : | |

---

**CHAPTER 11 TRUSTEE'S SECOND AMENDED JOINT PLAN OF
REORGANIZATION**

---

SCHNADER HARRISON SEGAL
& LEWIS LLP
Barry E. Bressler
Wilbur L. Kipnes
Richard A. Barkasy
Michael J. Barrie
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania  19103-7286
(215) 751-2000

-and-

WEIR & PARTNERS LLP
Kenneth E. Aaron (#4043)
824 Market Street Mall, Suite 1001
P.O. Box 708
Wilmington, Delaware 19899
(302) 652-8181

Co-Counsel to Arlin M. Adams,
Chapter 11 Trustee

Arlin M. Adams, Chapter 11 Trustee (the "Trustee") of Coram Healthcare Corporation and Coram, Inc., hereby proposes the following Second Amended Joint Chapter 11 Plan of Reorganization (the "Plan"), pursuant to Section 1123 of the Bankruptcy Code.

## ARTICLE 1

## DEFINITIONS

As used in this Plan, the following terms shall have the respective meanings specified below, unless the context requires otherwise:

1.1     **"Administrative Claim"** means any cost or expense of administration of the Chapter 11 Case under Section 503(b) of the Bankruptcy Code, including, without limitation, any and all expenses of preserving the Debtors' estates; any and all expenses of each Debtor, individually; any and all allowances of compensation or reimbursement of expenses, to the extent allowed by the Bankruptcy Court under Section 330 of the Bankruptcy Code; and any and all fees or charges assessed against the estate under Chapter 123 of Title 28 of the United States Code.

1.2     **"Allowed"** means a claim which is either scheduled pursuant to Section 521(1) of the Bankruptcy Code (other than a Claim scheduled as disputed, contingent or unliquidated) or which was filed pursuant to Section 501(a) of the Bankruptcy Code on or before the September 29, 2000 bar date established by the Bankruptcy Court, and with respect to which either no objection to the allowance thereof has been interposed within the period of limitation fixed by the Bankruptcy Court, or any such objection has been determined by an order of the Bankruptcy Court; and further means and includes any Administrative Claim, as approved by an order of the Bankruptcy Court.

1

1.3    **"Allowed Equity Interest"** means an Equity Interest as of the Record Date.

1.4    **"Amaral"** means Donald J. Amaral.

1.5    **"Bankruptcy Code"** means Title I of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101, *et seq.*

1.6    **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over this Chapter 11 Case.

1.7    **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, Fed. R. Bankr. P. 1001, *et seq.*

1.8    **"Casey"** means William J. Casey.

1.9    **"Cash"** means legal tender of the United States or equivalents thereof.

1.10    **"Causes of Action"** means any claims, rights, causes of action of the Debtors, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, based in whole or in part upon any act, omission or other occurrence having taken place on or prior to the Effective Date in any way relating to the Debtor, including, but not limited to: (a) any avoidance or recovery action under Sections 542, 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, whether or not previously commenced by the Trustee; (b) the Debtors' claims against PricewaterhouseCoopers LLP; and (c) any claims that the Debtors may have against Crowley, Amaral, Casey, Smith and/or Smoley, including the Proposed Derivative Claims.

1.11    **"Chapter 11"** means Chapter 11 of the Bankruptcy Code.

2

1.27    "**Disclosure Statement**" means the Trustee's disclosure statement, accompanying the Plan, as amended, supplemented or modified from time to time.

1.28    "**Disputed Claim**" means any Claim (a) to the extent that allowance of such Claim is the subject of an objection or a motion to estimate that was interposed within the period of limitation fixed by the Bankruptcy Court; (b) which is scheduled by the Debtors as disputed, contingent or unliquidated; or (c) was filed as unliquidated or contingent.

1.29    "**Distribution**" means a payment of Cash or other consideration to be made to holders of Allowed Claims or Allowed Equity Interests under the terms and conditions of the Plan.

1.30    "**Distribution Date**" means the first business day which is not more than 90 calendar days after the Effective Date.

1.31    "**Effective Date**" means the first business day that is not less than thirty (30) calendar days after the Confirmation Date, unless the time is shortened by order of the Bankruptcy Court.

1.32    "**Equity Committee**" means the Official Committee of Equity Security Holders of CHC appointed by the United States Trustee on October 18, 2000 pursuant to Section 1102(a) of the Bankruptcy Code.

1.33    "**Equity Interest**" means any interest in CHC represented by duly authorized, validly issued and outstanding shares of stock.

1.59    "**R-Net**" means Coram Resource Network, Inc. and Coram Independent Practice Association, Inc.

1.60    "**R-Net Adversary Proceeding**" means the adversary proceeding (Adv. Proc. No. 01-08795) filed by the R-Net Committee against CHC, Coram and other defendants which is pending in the United States District Court for the District of Delaware.

1.61    "**R-Net Committee**" means the Official Committee of Unsecured Creditors appointed in R-Net's Chapter 11 bankruptcy case (Case No. 99-2889 (MFW)), pending in the United States Bankruptcy Court for the District of Delaware.

1.62    "**R-Net Settlement Agreement**" means the Settlement Agreement among the Trustee, R-Net and the R-Net Committee, a copy of which shall be included in the Plan Supplement.

1.63    "**Secured Claim**" means any Claim that is secured, and only to the extent secured, pursuant to Section 506 of the Bankruptcy Code.

1.64    "**Smith**" means Peter Smith.

1.65    "**Smoley**" means Sandra L. Smoley.

## ARTICLE 2

## CLASSIFICATION OF CLAIMS AND INTERESTS

**A.**    **Unclassified Claims (Not Entitled to Vote on the Plan)**

1.    Administrative Claims

2.    Priority Tax Claims

**B.**    **Summary of Classified Claims and Interests**

10

satisfaction of the Disbursing Agent. In accordance with Section 1143 of the Bankruptcy Code,

any holder of an Equity Interest that (i) fails to surrender or cause to be surrendered such

instrument, or (ii) fails to execute and deliver an affidavit of loss and/or indemnity reasonably

satisfactory to the Disbursing Agent and furnish a bond in form, substance and amount

reasonably satisfactory to the Disbursing Agent, in each case within one (1) year after the

Effective Date, shall be deemed to have forfeited forever all rights, claims, and interests in

respect of said Distribution and shall not thereafter have any right to participate in any

Distribution under the Plan.

      5.3    **The Causes of Action**. The Trustee shall retain the sole and exclusive

right, from and after the Effective Date, to commence, prosecute, compromise and seek

Bankruptcy Court approval of any settlement of any of the Causes of Action on behalf of the

Debtors' estate; provided, however, that no action or cause of action shall be commenced or

maintained against any Person to be released as provided in Article 9 of this Plan. Reorganized

Coram shall be responsible for payment of all Post-Effective Date Administrative Claims related

to the Causes of Action. The proceeds of the Causes of Action, if any, shall be distributed as

follows: (a) First, to Reorganized Coram in an amount equal to the Post-Effective Date

Administrative Claims relating to the Causes of Action; (b) Second, to the holders of Allowed

General Unsecured Claims on a *pro rata* basis in an amount equal to the interest accruing (at the

statutory judgment rate set forth in Section 1961 of Title 28 of the United States Code) from the

Petition Date through the Effective Date on account of such Allowed General Unsecured Claims

until such interest has been paid in full; and (c) Third, on a *pro rata* basis to the holders of CHC

Equity Interests.

and all claims arising out of or related to the relationship between the Debtors and the Releasees, including the Proposed Derivative Claims. The release shall not include any of the Debtors' claims against Crowley, Amaral, Casey, Smith and Smoley, including the Proposed Derivative Claims.

7.2    **R-Net Settlement.**  The Trustee has entered into the R-Net Settlement Agreement to settle the R-Net Adversary Proceeding and all Claims asserted by R-Net against the Debtors.  Pursuant to the R-Net Settlement Agreement, R-Net's General Unsecured Claim against the Debtors shall be reduced from more than $41,000,000.00 to $7,950,000.00 and the claim filed by CHC in R-Net's bankruptcy case shall be reduced to $1,000.00.

## ARTICLE 8

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

Except as otherwise provided in the Plan, as of the Effective Date, CHC and Coram shall be deemed to have assumed each executory contract and unexpired lease to which they are parties, unless such contract or lease (i) was previously assumed or rejected; (ii) previously expired or terminated pursuant to its own terms; or (iii) is on a list of executory contracts to be rejected that is on a list contained in the Plan Supplement.  Any executory contract and unexpired lease to which CHC is a party (and which has not been rejected) shall be, as of the Effective Date, deemed to be assigned to, and assumed by, Reorganized Coram.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365 of the Bankruptcy Code approving the contract and lease assumptions and assignments described above, as of the Effective Date.

Exit Facility documents and a list of executory contracts and leases to be rejected pursuant to the Plan.

      **15.11 Revocation.** The Trustee reserves the right to revoke and withdraw this Plan at any time prior to the entry of the Confirmation Order. If this Plan is so withdrawn, then it shall be deemed null and void.

      Respectfully Submitted,


      /s/ Arlin M. Adams
      Arlin M. Adams, Chapter 11 Trustee of the
      Bankruptcy Estates of Coram
      Healthcare Corp. and Coram, Inc.


Of Counsel

SCHNADER HARRISON SEGAL
      & LEWIS LLP
Barry E. Bressler
Wilbur L. Kipnes
Richard A. Barkasy
Michael J. Barrie
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000


Dated: April 15, 2004
      Philadelphia, Pennsylvania

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| CORAM HEALTHCARE CORP. and CORAM, INC., | : Case No. 00-3299 (MFW) |
| | : |
| | : (Jointly Administered) |
| Debtors. | : |
| | : |
| | : |
| ARLIN M. ADAMS, as Chapter 11 Trustee of the Bankruptcy Estates of Coram Healthcare Corp. and Coram, Inc. | : Adv. Proc. No. 06-50639-MFW |
| | : |
| | : |
| | : |
| Plaintiff/Appellee, | : |
| | : |
| v. | : |
| | : |
| GENESIS INSURANCE COMPANY, | : |
| | : |
| Defendant/Appellant. | : |
| | : |

## <u>CERTIFICATE OF SERVICE</u>

I, Michael J. Barrie, certify that I am not less than 18 years of age and that on September 15, 2006, I caused to be electronically filed with the Court the Corrected Answering Brief Of Plaintiff Arlin M. Adams, Chapter 11 Trustee Of Coram Healthcare Corp. and Coram, Inc. (i) In Opposition To Motion Of Genesis Insurance Company For Leave To Appeal, And (II) In Support Of Cross-Motion To Dismiss Appeal, using CM/ECF, which will send notification of such filing to the following:

Carmella P. Keener, Esq.
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market St., Suite 1401
Citizens Bank Center
Wilmington, DE 19801

Dated:   September 15, 2006                    SCHNADER HARRISON SEGAL
                                                & LEWIS LLP


                                        By:   /s/ Michael J. Barrie
                                                Michael J. Barrie (#4684)
                                                824 Market St., Suite 1001
                                                Wilmington, Delaware 19801
                                                (302) 888-4554 (telephone)
                                                (302) 888-1696 (facsimile)


2